#28808-a-JMK
**2019 S.D. 44**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

MICHAEL LAMMERS,                                    Plaintiff and Appellant,

  v.

STATE OF SOUTH DAKOTA, BY
AND THROUGH THE DEPARTMENT
OF GAME, FISH AND PARKS,                        Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
DEUEL COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE DAWN M. ELSHERE
Judge

\* \* \* \*

MARK V. MEIERHENRY
CLINT SARGENT
RALEIGH HANSMAN of
Meierhenry Sargent, LLP
Sioux Falls, South Dakota                  Attorneys for plaintiff
                                                           and appellant.


JASON R. RAVNSBORG
Attorney General

DAVID M. MCVEY
Assistant Attorney General
Pierre, South Dakota                        Attorneys for defendant
                                                          and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS ON
MAY 28, 2019
OPINION FILED **07/17/19**

#28808

KERN, Justice

[¶1.]       South Dakota Game, Fish & Parks (Department) entered Michael Lammers's farmland in Deuel County to build a new fence after a survey indicated that the physical boundaries between their properties did not coincide with the surveyed boundaries. Lammers filed an action against the Department seeking a declaratory judgment and permanent injunction. The Department moved for summary judgment, which the circuit court granted. We affirm.

**Facts and Procedural History**

[¶2.]       Lammers owns and farms two tracts of land in Section 16 of Altamont Township, Deuel County. Tract 1 comprises the north half of the southwest quarter and the southwest quarter of the southwest quarter of Section 16. Tract 2 is the southwest quarter of the southeast quarter. The northwest quarter of the southeast quarter of Section 16 is owned and maintained by the Department as a game production area.[1] It borders Tract 1 to the east and Tract 2 to the north.

[¶3.]       Altamont Township was first surveyed by the United States in 1872. In 1889, an Enabling Act passed by Congress admitted South Dakota to the Union and granted the State 3.5 million acres of land, including all of Section 16. Fred Rabine obtained Tract 1 through purchases from the State in 1947 and 1962. He obtained title to Tract 2 in 1960. Lammers began farming Tracts 1 and 2 for Rabine in 1992. He eventually purchased Tract 1 in 2005 and Tract 2 in 2012 from Rabine.

---

1.     The Department owns and maintains other parts of Section 16, but the northwest quarter of the southeast quarter is the only parcel relevant to this appeal.

-1-

The State granted the Department land within Section 16, including the land bordering Tracts 1 and 2, in 1962. The land currently owned and maintained by the Department has thus been continually held by the State or its agencies since the original grant from the United States in 1889.

[¶4.] A north-south quarter line in the middle of Section 16 has been historically recognized by physical markers creating a "fence line." These markers include old growth trees, signs posted by the Department, and in recent years an electric fence. The boundaries are also marked by the differing uses of the land—with agricultural property separated from the game production area. In 2013, the Department retained Mack Land Surveying to conduct a new survey of Section 16 as part of a project to replace fences bordering State lands. Sometime in the spring of 2014, Lammers and other landowners were approached by Department officials informing them that according to the new survey, the existing boundaries were incorrect. In September 2016, Lammers received a letter from the Department informing him that a new north-south fence would be constructed that would move the border 107 feet west of the fence line to reflect the surveyed boundary, resulting in Lammers losing 2.5 acres from Tract 1 and 1 acre from Tract 2. Department officials entered the land previously farmed by Lammers to pound steel posts into the field to mark the surveyed boundary.

[¶5.] On May 25, 2017, Lammers filed a complaint for a declaratory judgment and permanent injunction. Lammers requested that the court declare the boundary to be at the historical fence line. He further argued in his complaint that his "occupation and use of the property also satisfies the elements of the doctrine of

adverse possession."[2] Pursuant to his request for a permanent injunction, Lammers demanded that the Department remove the steel fence posts.

[¶6.] The Department filed a motion to dismiss, arguing that Lammers was essentially claiming that he had acquired land from the State through adverse possession and such claim was barred by Article VIII, section 10 of the South Dakota Constitution.[3] Following a hearing, the circuit court denied the motion to dismiss, finding that although the complaint read "a lot like a complaint for adverse possession," there were enough other points raised to indicate a question of fact regarding the location of the true boundary.

[¶7.] The Department then moved for summary judgment. It first reiterated its argument that because the surveys indicated that these lands were in fact owned by the Department, there was no way Lammers could obtain these lands through adverse possession. Furthermore, it maintained that none of the surveys of Section 16 indicated that the north-south quarter line established in 1872 was consistent with the fence line. Lammers argued that a material issue of fact existed regarding the proper location of the boundaries in Section 16 since the original

2. "Adverse possession occurs when there is (1) an occupation that is (2) open and notorious, (3) continuous for the statutory period, and (4) under a claim of title exclusive of any other right." *Underhill v. Mattson*, 2016 S.D. 69, ¶ 11, 886 N.W.2d 348, 352.

3. Lammers argued in his complaint that because the parties had acquiesced to the location of the boundaries since at least 1947, the existing boundary should be declared the legal boundary. The doctrine of acquiescence provides "an evidentiary presumption as to the element of hostility [of adverse possession] and applies even though the occupancy occurred due to ignorance, inadvertence, or mistake, and without an intention to claim the lands of another." *City of Deadwood v. Summit, Inc.*, 2000 S.D. 29, ¶ 22, 607 N.W.2d 22, 28.

corner markers used to create the 1872 survey no longer existed. The original corner markers were charred oak stakes driven into dirt mounds. They have since been obliterated—meaning lost—so subsequent surveyors have used collateral evidence to locate the section corners. Lammers maintained that the historically recognized boundaries were the best available evidence of true boundaries. The parties submitted several key surveys into evidence, including the original 1872 survey, two surveys by Wayne Haug (one undated and one from 1996), the Mack survey from 2013, and an Aason Engineering survey from 2016.

[¶8.] The circuit court heard oral argument from the parties at a hearing on September 24, 2018. It issued a memorandum opinion on September 27, 2018, granting summary judgment to the Department. The court concluded that Lammers's argument was based in part on a claim of adverse possession against the State which was precluded under the South Dakota Constitution. It also determined that the surveys, patents, and property descriptions showed that there was no genuine dispute of material fact regarding the disputed boundaries. The court entered findings of fact and conclusions of law on October 11, 2018.[4] Lammers appeals, raising one issue:

> Whether the circuit court erred in granting summary judgment to the Department.

---

4. Although the court entered findings of fact and conclusions of law, in a summary judgment proceeding "findings of fact and conclusions of law [are] unnecessary." *Bergin v. Bistodeau*, 2002 S.D. 53, ¶ 25 n.2, 645 N.W.2d 252, 257 n.2; SDCL 15-6-52(a). This is because in such a proceeding, the question is "whether or not there is a genuine issue of fact. It does not contemplate that the court shall decide such issue of fact, but shall determine only whether one exists." *Id.*

**Standard of Review**

[¶9.]     "We review a circuit court's entry of summary judgment under the de novo standard of review.  When conducting a de novo review, we give no deference to the circuit court's decision to grant summary judgment.  When reviewing a circuit court's grant of summary judgment, this Court only decides whether genuine issues of material fact exist and whether the law was correctly applied."  *Larimer v. Am. Family Mut. Ins. Co.*, 2019 S.D. 21, ¶ 6, 926 N.W.2d 472, 475.  "We view the evidence most favorably to the nonmoving party and resolve reasonable doubts against the moving party."  *State Auto Ins. Cos. v. B.N.C.*, 2005 S.D. 89, ¶ 6, 702 N.W.2d 379, 382.  The party resisting summary judgment must present "sufficient probative evidence that would permit a finding in her favor on more than mere speculation, conjecture, or fantasy."  *Schaefer v. Sioux Spine & Sport, Prof. LLC*, 2018 S.D. 5, ¶ 9, 906 N.W.2d 427, 431.  "[M]ere general allegations and denials which do not set forth specific facts will not prevent the issuance of a judgment."  *Bordeaux v. Shannon Cty. Schs.*, 2005 S.D. 117, ¶ 14, 707 N.W.2d 123, 127.

**Analysis**

[¶10.]     An original government survey conducted under the laws of the federal government by its official agency creates boundaries which are unchangeable and control boundary disputes.  *Titus v. Chapman*, 2004 S.D. 106, ¶¶ 17-18, 687 N.W.2d 918, 924.  Subsequent surveys by private individuals are more aptly described as "retracings" or "resurveys."  *Id.* ¶ 18, 687 N.W.2d at 924.  In resurveys, surveyors must "take care to observe and follow the boundaries and monuments as run and

marked by the original survey." *Id.* "Where the original monument is obliterated, that is it cannot be located nor established by evidence, then a corner can be established by a new survey." *Id.* ¶ 19, 687 N.W.2d at 924; *see also* SDCL 43-18-7 ("In retracing lines or making the survey the surveyor shall take care to observe and follow the boundaries and monuments as run and marked by the original survey[.]").

[¶11.]      Lammers maintains that this case is not about adverse possession—instead it is about the proper legal boundary between his land and the land owned by the Department as established by the original 1872 government survey. He argues that there are conflicting surveyor opinions in the record regarding what is proper collateral evidence of the original section markers, creating a genuine issue of material fact precluding summary judgment.

[¶12.]      In support of his assertions, Lammers cites the opinion of Emmett Kotrba, a registered land surveyor who visited Lammers's property and reviewed the 1996 Haug survey. Kotrba did not conduct his own survey but opined in a letter written to Lammers's counsel that "all of the survey marks now in place were NOT IN PLACE when the land was patented in 1947. However, all evidence both physical and parole show that the now existing boundary between the [Department] and Mr. Lammers DID EXIST at the time of the patent." Kotrba further stated that fences are acceptable as the best available evidence when original markers are unavailable. Because, Kotrba asserted, that the Haug survey established that the south end of the fence was positioned at the south quarter corner—or midpoint of the southern border of Section 16—he concluded "that the established existing fence

has been accepted as the boundary between the [Department] and Mr. Lammers." Lammers argues that because the Department surveyor used the now existing roadways—not the fence line—as a basis for establishing the boundary lines, there is a genuine dispute of material fact regarding the proper position of the north-south quarter line.

[¶13.] The Department contends that Lammers has inaccurately asserted that there are competing surveyor opinions. It argues that Lammers has not submitted any evidence indicating that later surveys deviate from the boundaries set in 1872. It also asserts that there is no evidence supporting a finding that the fence line represents the true boundary; rather, it argues that all evidence shows that the fence line deviates from the true boundary by missing the center of the section by 107 feet to the east.

[¶14.] A review of the various surveys in the record reveals no disputed material facts concerning the boundary between Lammers's and the Department's land. The original 1872 survey created by the U.S. government sets forth the rectangular section and quarters typical for the system of Rectangular Surveying described in the 1868 Manual of Rectangular Surveying employed to survey public lands. There is no indication that the north-south quarter line deviates from the center of the section towards the east, nor does it show a fence line as a boundary.

[¶15.] The next survey of Section 16 is the Haug survey from 1996. The survey focuses upon the southwest quarter but does show a straight north-south quarter line. It does not depict the quarter line deviating to the east. It also does not illustrate a fence, but it does show, as Kotrba pointed out, that the south

quarter corner is located where the south end of the fence is now situated. Lammers also introduced another, undated, Haug survey of a tract of land within the northeast quarter of the northwest quarter. The survey shows the location of the north quarter corner and indicates a straight boundary extending south from the corner.

[¶16.]     The first survey to show the fence line was the 2013 Mack survey obtained by the Department. This survey reflects straight section and quarter lines. It shows the north-south quarter line on each end of Section 16 starting at the same north-south point as the established fence line, but then depicts the fence line drifting eastward from the north-south quarter line at the center. Lammers then retained Aason Engineering in 2016 to complete a survey of Section 16. The 2016 survey shows the same straight section and quarter line boundaries as the 2013 Mack survey. It also expressly notes that while the fence line intersects with the north and south quarter corners at the midpoints of the northern and southern borders of the section, it deviates from the center of the section by 107 feet to the east.

[¶17.]     The surveys from 1996, 2013, and 2016 are consistent with the 1872 survey and show the same corners for Section 16 and a straight north-south quarter line which does not deviate from the center of the section.[5] While the corner markers used by the U.S. government to create the 1872 survey no longer exist, the

---

5.     Additionally, the abstract of title and patents for Tract 1 only use legal descriptions of the property and do not reference fence lines or boundaries other than those used in the original survey description.

2009 Bureau of Land Management Manual of Surveying Instructions produced by the U.S. Department of the Interior sets forth methods for locating obliterated section corners using collateral evidence such as roads, fences, or other signs of use or occupancy.[6] Once section corners are set, a system of proportionate measurement may then be used to set quarter lines within the section. The Department argued to the circuit court that all the experts—the two surveyors retained by Lammers and the Department's surveyor—agreed that quarter lines are generated by finding the midpoint of each section line and connecting the midpoints to draw straight lines running north-south and east-west. Lammers has not pointed to evidence suggesting a dispute regarding this method of setting quarter lines.

[¶18.] While Lammers argues that there is a genuine issue of material fact regarding the proper position of the boundaries based on different methods for locating the missing section corners, he fails to point to evidence beyond mere speculation suggesting that any of the survey techniques used by the various surveyors of Section 16 resulted in misidentified corners. Rather, all the surveys, including his own, identify the same section lines and midpoints for the quarter sections. Lammers fails to provide evidence of a genuine disagreement about where the true corners or section lines are located, or the methods used by the surveyors to set the missing corners.

---

6.     Chapter 6 of the manual on resurveying techniques was introduced into
       evidence.

[¶19.] Taken together, all the surveys, as well as Kotrba's expert opinions, show that while the fence line was historically recognized as the north-south quarter line by those owning property in Section 16, it, in fact, did not mark the controlling surveyed boundaries established by the United States in 1872. The evidence is undisputed that the fence line intersects with quarter corners on the north and south, but drifts from the true north-south quarter line in the center of the section and encroaches on the Department's land.

[¶20.] Because Lammers has not demonstrated a genuine issue of material fact regarding the true position of the boundaries in Section 16, the evidence of historically recognized boundaries and his use of the property does not advance his claim. There is no dispute that the land owned by the Department has been held by the State or its agencies since the original grant from the United States in 1889. Article VIII, section 10 of the South Dakota Constitution provides that "[n]o claim to any public lands by any trespasser thereon by reason of occupancy, cultivation or improvement thereof, shall ever be recognized; nor shall compensation ever be made on account of any improvements made by such trespasser." Based on a plain reading of this constitutional provision, a citizen may not take land from the State through adverse possession. *See Doe v. Nelson*, 2004 S.D. 62, ¶ 9, 680 N.W.2d 302, 305. Additionally, we have already recognized that individuals may not obtain prescriptive easements—the non-possessory equivalent of adverse possession— against government property. *Steiner v. Cty. of Marshall*, 1997 S.D. 109, ¶ 23,

568 N.W.2d 627, 632.[7] Since Lammers cannot claim the land based on his occupancy and cultivation of the land or historical acceptance of the boundary, the fence merely represents a mistaken intrusion onto the State's property. The circuit court did not err in granting summary judgment to the Department.

[¶21.]     GILBERTSON, Chief Justice, and JENSEN and SALTER, Justices, concur.

---

7.    Akin to adverse possession, "to claim the benefit of an easement by prescription, a person must show open, continued, and unmolested use of the land in the possession of another for the statutory period. The statutory period for prescriptive easements, like that for adverse possession, is twenty years." *Steiner*, 1997 S.D. 109, ¶ 18, 568 N.W.2d at 631.