#29706, #29716-aff in pt & rev in pt-MES
**2022 S.D. 44**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

HEALY RANCH PARTNERSHIP,
a South Dakota General Partnership,                    Plaintiff and Appellant,

v.

LARRY MINES, SHEILA MINES,                    Defendants and Appellees,

and

MARY ANN OSBORNE f/k/a MARY
ANN HEALY, individually and as the
Executrix of the Estate of Robert Emmett
Healy, and the ESTATE OF ROBERT
EMMETT HEALY, the ESTATE OF
RANDOLPH SHARPING, the ESTATE OF
EVELYN SHARPING, BRULE COUNTY,
and ALL UNKNOWN ASSIGNEES,
GRANTEES AND BENEFICIARIES OF THE
HERETO-NAMED DEFENDANTS, and ALL
OTHER UNKNOWN PARTIES WHO HAVE
OR CLAIM TO HAVE ANY INTEREST OR
ESTATE IN OR LIEN OR ENCUMBERANCE
UPON THE FOLLOWING REAL ESTATE
LOCATED IN BRULE COUNTY, SOUTH
DAKOTA,
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
LOT RH-2, SHARPING SUBDIVISION, IN
PORTIONS OF THE NORTHWEST QUARTER
(NW 1/4) AND MEANDER LOTS TWO (2),
THREE (3), AND FIVE (5) IN THE SOUTHWEST
QUARTER (SW 1/4) OF SECTION TWENTY-
THREE (23), TOWNSHIP ONE HUNDRED
FOUR (104) NORTH, RANGE SEVENTY (70)
WEST OF THE 5TH P.M., BRULE COUNTY,
SOUTH DAKOTA,                                      Defendants.

* * * *

CONSIDERED ON BRIEFS
FEBRUARY 14, 2022
OPINION FILED **08/03/22**

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
BRULE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE PATRICK T. SMITH
Judge

\* \* \* \*

CHRIS MCCLURE of
McClure & Hardy, Prof. LLC
Sioux Falls, South Dakota

ANGIE SCHNEIDERMAN of
Moore, Corbett, Heffernan,
    Moeller & Meis, LLP
Sioux City, Iowa                    Attorneys for plaintiff and
                                    appellant.


LEE SCHOENBECK
JOE ERICKSON of
Schoenbeck & Erickson, P.C.
Watertown, South Dakota             Attorneys for defendants and
                                    appellees.

SALTER, Justice

[¶1.]        Healy Ranch Partnership (HRP) commenced this action to quiet title to a parcel of land located in Brule County.  The complaint named multiple defendants, including the current possessors of the land, the previous possessors, and another member of HRP.  The individuals currently in possession of the land filed a counterclaim, alleging they had acquired title through adverse possession. The circuit court decided motions to dismiss and for summary judgment adversely to HRP, determining that the current possessors of the land acquired title by adverse possession.  HRP appeals.  We reverse the court's decision to grant the motion to dismiss but affirm its summary judgment decision quieting title in favor of the current possessors.

## Facts and Procedural History

### *The Healy Ranch and Lot RH-2*

[¶2.]        The Healy Ranch (the Ranch) is comprised of approximately 1,700 acres of farm and ranch land located in Brule County.  Disputes over ownership of the Ranch and acrimony among members of the Healy family have led to a series of litigated cases since 2017, including our decision in *Healy v. Osborne*, 2019 S.D. 56, 934 N.W.2d 557, which we describe further below.

[¶3.]        Originally owned by Emmet and DeLonde Healy, certain tracts of real property that make up the Ranch have, it appears, been conveyed, leased, mortgaged, refinanced, possessed by third parties, included in bankruptcy proceedings, sharecropped, and passed through the probates of various estates since

at least the 1960s. At issue in this appeal is a single, 46-acre tract of property, commonly known as Lot RH-2, or simply RH-2.[1]

[¶4.]        For purposes of our discussion here, RH-2 was originally owned by Sheldon and Elsie Munger as part of a larger tract of land. In 1973, HRP—at that time consisting of DeLonde Healy, her son Robert Healy, and Robert's wife, Mary Ann Healy[2]—entered into a contract for deed with the Mungers to purchase the entire tract of land, which contained the lot eventually designated as RH-2.

[¶5.]        In 1986, Sheldon Munger transferred his interest in RH-2 to Phyllis Kott who, with her husband, conveyed the parcel to HRP in April 1990 upon satisfaction of the contract for deed. The deed for RH-2 was recorded later the same month.

[¶6.]        Between the initiation of the contract for deed with the Mungers and the eventual recordation of the warranty deed in April 1990, several events transpired. Robert Healy passed away, leaving his interest in HRP to his wife, Mary Ann, and resulting in what the record suggests was an equal partnership between Mary Ann and DeLonde.

[¶7.]        In addition, one of Robert and Mary Ann's three sons, Bret, returned from South Dakota State University in 1986 to take on a larger role in the management of the Ranch. In an effort to facilitate Bret's transition, Mary Ann,

---

1.    RH-2 is legally described as: "Lot RH-2, Sharping Subdivision, in portions of the Northwest Quarter (NW 1/4) and Meander Lots Two (2), Three (3), and Five (5) in the Southwest Quarter (SW 1/4) of Section Twenty-three (23), Township One Hundred Four (104) North, Range Seventy (70) West of the 5th P.M., Brule County, South Dakota."

2.    Emmet Healy had, by this time, passed away.

DeLonde, and Bret executed a new partnership agreement, under which DeLonde would relinquish what was described as "her 25% interest in Healy Ranch Partnership" to Bret in exchange for various lifetime benefits and being relieved of all responsibility for the Ranch's debts. The resulting iteration of HRP is sometimes referred to as the 1986 Partnership.[3]

[¶8.]      As Bret began his new role with the Ranch in 1986, it was in the midst of bankruptcy proceedings. Bret claims he helped guide the Ranch through its bankruptcy plan in a way that preserved the family's ownership interest in the real estate and allowed the Ranch to continue operating as a going concern. At various times during the course of his management, Bret leased the entirety of the Ranch's cropland to local farmers and also operated his own separate feedlot business.

[¶9.]      In 1989, Bret moved out of state and did not return to the Ranch until 2006. In the interim, it appears as though Bret remained involved in its business. The sequence of events that are at the center of this case begin in 1990, around the time Phyllis Kott transferred the 46-acre RH-2 tract at issue here to HRP pursuant to the contract for deed.

[¶10.]     At some later point in 1990, HRP entered into negotiations to sell RH-2 to Raymond Sharping. What ultimately became of their negotiations is unclear, but three facts are undisputed: 1) Raymond began possessing and farming the 46-acre tract and paying the property taxes associated with it; 2) no member of the Healy family, either individually or on behalf of the Ranch, has possessed, farmed, or paid

---

3.      In his submissions to the circuit court, Bret stated only that the current action is brought in the name of HRP.

real estate taxes associated with RH-2 since 1990; and 3) Mary Ann executed a warranty deed on August 1, 1992, conveying RH-2 to Raymond and Evelyn Sharping.[4]

***Post-1990 possession of RH-2***

[¶11.]     In 1993, Evelyn Sharping passed away. A circuit court order from October of that year indicates that Raymond successfully terminated Evelyn's life estate in RH-2, as well as other tracts of real estate. The termination of Evelyn's life estate in RH-2 was later recorded with the Brule County Register of Deeds.

[¶12.]     It appears Raymond Sharping continued to farm RH-2 and pay the real estate taxes until his death in 1998. Raymond's will, dated January 24, 1996, devised to his son, Randolph Sharping, "all real estate which I *may* own" in the area approximating the legal description of RH-2, though it did not specifically list the parcel by that designation. (Emphasis added). The will also severed the mineral rights, which Raymond divided equally among his children.

[¶13.]     Upon Raymond's death, his daughter, Crystal Ashley, was appointed to serve as the personal representative of his estate. Acting in this capacity, Crystal issued three personal representative's deeds, which divided the mineral rights to RH-2 among Raymond's three children—Crystal Ashley, Alice Sharping, and Randolph Sharping. Crystal also executed a fourth personal representative's deed conveying Raymond's remaining interest in RH-2 to Randolph Sharping. Each of the deeds were recorded with the Brule County Register of Deeds in June 2000.

---

4.     Raymond and Evelyn were husband and wife.

[¶14.]    It seems undisputed that Randolph, like his father, farmed and paid the taxes on RH-2 until his death in 2012. Between June and July 2012, Randolph's siblings executed and recorded quitclaim deeds conveying the mineral rights of RH-2 back to Randolph. Prior to his death, Randolph executed and recorded a warranty deed for RH-2 on June 21, 2012, in favor of Larry and Sheila Mines. On June 26—five days after the deed from Randolph to the Mineses was executed—Bryce Healy,[5] acting on behalf of the Healy Ranch corporate entity, Healy Ranch, Inc. (HRI), executed and recorded a quitclaim deed to RH-2 in favor of Randolph. Randolph's estate, in turn, then issued a personal representative's deed for RH-2 to the Mineses, who have subsequently possessed the land, farmed it, and paid the taxes.

### The Healys' post-1990 treatment of RH-2

[¶15.]    Mary Ann signed the 1992 warranty deed conveying RH-2 to the Sharpings in her personal capacity and as the executor of her late husband Robert's estate. The deed was never recorded, and the record does not reveal whether it was ever delivered. Bret claims to have first discovered the deed in April 2017 in a file at the law office of the family's former attorney. A few days after Mary Ann signed the 1992 Sharping deed, the Brule County Planning Commission approved her dedication and plat, which designated the 46-acre tract as Lot RH-2 of "Sharping Subdivision."

---

5.    As explained below, Bryce Healy is one of Bret's brothers and a shareholder in HRI.

[¶16.]    Sometime in 1994, Mary Ann[6] created the corporate entity known as Healy Ranch, Inc., which we refer to here as HRI, listing herself as the sole shareholder.  In 1995, Mary Ann and DeLonde executed a warranty deed purporting to transfer the Ranch real estate from HRP to HRI, with the exception of RH-2.  Over the next several years, Bret and his two brothers, Bryce and Barry, purchased shares in HRI from Mary Ann until they each owned an undivided 1/3 interest.

[¶17.]    Though not central to the issues before us in this appeal, Bret's view of the relationship between HRI and HRP permeates his ongoing disputes with his mother and brothers.  According to Bret, HRP remains the true owner of the Ranch's 1,700 acres of agricultural land because Mary Ann was not authorized to transfer HRP's real estate to HRI without his consent.  Bret reasons that Mary Ann essentially converted her own 75% interest in HRP into HRI, which then became a partner, with Bret, in HRP.  Under this theory, Bret and his brothers purchased only their mother's 75% interest and left intact Bret's 25% interest under the 1986 partnership agreement.  However, after its creation, it appears the Ranch's lenders dealt only with HRI and, most often, with Bret who is listed on loan documents as HRI's president.

[¶18.]    In any event, during the years following the Sharpings' possession of RH-2, Bret executed several documents that excluded RH-2 from the Ranch's real estate holdings, including a 1992 lease and agency agreement and a 1999 mortgage.

---

6.    Mary Ann had remarried by this time and became known as Mary Ann Osborne.

Bret states he was aware that the Sharpings began farming RH-2 in 1990, but his view of the circumstances under which they did so appears to have varied over the course of litigation involving the Ranch.

[¶19.]     In *Healy v. Osborne*, commenced in May 2017, Bret claimed that Mary Ann and the family's attorney had acted fraudulently to *transfer* RH-2 without authority. *See* 2019 S.D. 56, ¶ 6 n.1, 934 N.W.2d at 560 n.1. Bret's discovery requests to Mary Ann taken from the *Healy v. Osborne* litigation and included in the record for this appeal indicate that Bret also believed Mary Ann had damaged him by not using the RH-2 sale proceeds to pay down HRP debt. In his deposition taken during the *Healy v. Osborne* litigation, Bret claimed that the transfer of RH-2 "has caused the loss of land" because, he explained:

> [I]t was transferred to Raymond Sharping. It made it through two probates . . . and then was sold to Larry Mines, and then Bryce Healy signed a quitclaim deed for it. So, yes, it has caused me to lose land that I won't get back because there were innocent buyers on RH-2 . . . .

[¶20.]     In this action, however, Bret now claims that RH-2 was not transferred at all. Under this more recent view, he contends that Mary Ann's lack of authority to transfer RH-2 means that any act to convey the property was "null and void" and, as a consequence, HRP still retains ownership. In an effort to amend his earlier deposition testimony, Bret now claims that HRP did not, in fact, "lose land" and that neither the Mineses nor the Sharpings were innocent purchasers. He asserts that all of them have, since 1990, possessed, farmed, and paid the taxes for RH-2 with the continuing permission of HRP, though apparently without rent or remuneration.

[¶21.] Bret cites as support for this theory a 1990 letter from the family's attorney regarding efforts to sell RH-2 to Raymond Sharping and acknowledging "the buyers already have possession of this property." In another letter to Raymond Sharping in 1991, the Healys' lawyer responded to Raymond's "concern[ ] about any money you spend on the property you are buying from Healy's [sic] prior to closing" by advising Raymond that the Healys would "reimburse you for those expenses[ ]" in the event the purchase of RH-2 was not completed.

***Healy v. Osborne***

[¶22.] In April 2017, as the parties contemplated a potential sale of the Ranch, a dispute arose among Mary Ann, Bret, and his two brothers about who owned the Ranch property—HRP, under Bret's theory set out above, or HRI. In the initial litigation that ensued, however, Bret did not directly seek to resolve the question of ownership. Instead, Bret commenced an action against Mary Ann, his brothers, and the family's attorney, alleging a variety of tort and contract claims, principally focused on the theory that Mary Ann had wrongfully conveyed Ranch property to HRI in 1995. Though RH-2 was not included among the 1,700 acres of real property HRI proposed to sell, Bret also litigated a separate claim against his mother, claiming Mary Ann had committed fraud by conveying RH-2 to the Sharpings, as indicated above. The circuit court granted the defendants' motions for summary judgment, concluding that the statutes of limitation had run on Bret's claims, and he appealed.

[¶23.] We affirmed and held that all of Bret's claims were time-barred because he had actual or constructive notice of the potential claims long before he

commenced the action. In so doing, we took care to confine our decision to the narrow issue of the timeliness of the claims. *See Healy*, 2019 S.D. 56, ¶¶ 20–21, 934 N.W.2d at 565. We observed that it was unnecessary to consider Bret's subsidiary arguments regarding ownership of the Ranch, further noting that "Bret did not bring a quiet title action challenging ownership to Healy Ranch." *Id.* ¶ 21 n.2, 934 N.W.2d at 565 n.2. We also affirmed an award of attorney fees in favor of the defendants after concluding that the circuit court had acted within its discretion when it found that Bret lacked a reasonable basis to believe that HRP—instead of HRI—owned the Ranch. *Id.* ¶ 37, 934 N.W.2d at 567.

### *The current action*

[¶24.]        After our decision in *Healy v. Osborne*, Bret filed this action in the name of HRP, seeking to quiet title to RH-2. HRP named as principal defendants Mary Ann, the Estate of Robert Healy, the Estates of Evelyn, Raymond, and Randolph Sharping, and Larry and Sheila Mines. The complaint alleged that HRP "holds title to an undivided fee simple interest in RH-2" by virtue of the 1990 warranty deed from Phyllis Kott.

[¶25.]        Mary Ann filed a motion to dismiss the complaint for failure to state a claim upon which relief could be granted, asserting she had no legal interest to RH-2. Mary Ann also asserted that Bret, as a minority partner in HRP, was not authorized to bring the quiet title action on behalf of HRP without her approval.

[¶26.]        The Mineses and the estates of Evelyn, Raymond, and Randolph Sharping filed a joint answer and counterclaim. Their answer denied HRP's claim

of ownership over RH-2, and the counterclaim alleged that the Sharpings and Mineses had acquired title to RH-2 through adverse possession.

[¶27.]     The Sharping estates and the Mineses later filed a joint motion to dismiss the complaint for failure to state a claim upon which relief could be granted, referencing the earlier motion to dismiss filed by Mary Ann. Their brief in support of the motion to dismiss was similar to the brief filed by Mary Ann and cited our previous decision in *Healy v. Osborne*, suggesting that the opinion resolved certain factual questions relating to ownership of the Ranch that precluded the relief sought by HRP in the quiet title action.

[¶28.]     The Mineses also filed a motion for summary judgment on their counterclaim for adverse possession, prompting HRP to seek what it described as partial summary judgment "regarding Plaintiff's chain of record title to [RH-2.]" In addition, HRP moved for a continuance under SDCL 15-6-56(f), seeking additional time to conduct discovery in order to oppose the Mineses' motion for summary judgment.[7]

[¶29.]     The circuit court conducted a hearing on the various motions and later issued a memorandum decision, granting the Mineses' motion to dismiss and motion for summary judgment and denying HRP's motion for partial summary judgment. The court determined the motion to dismiss, in part, by applying the doctrine of res judicata and concluding that our holding in *Healy v. Osborne* constituted an implicit affirmance of the *Healy v. Osborne* circuit court's finding

---

7.     HRP stipulated to the dismissal of Mary Ann and the Sharping estates while the pretrial motions were pending.

that HRP had no interest in any of the Ranch property. The court also determined that Bret lacked authority to bring an action in the name of HRP as an additional basis for granting the motion to dismiss. Again drawing from our holding in *Healy v. Osborne*, the court concluded that HRP "never had title to RH-2" and, therefore, had no basis to assert ownership in a quiet title action.

[¶30.] The circuit court's determination of the motions for summary judgment seems to have been an alternative disposition of the case in which the court concluded, among other things, that the Mineses had established the elements for adverse possession under SDCL 15-3-15 because the Mineses and Sharpings were acting under color of title, paid all taxes, and possessed RH-2 over the course of almost thirty years. The court reasoned that the warranty deed issued by Mary Ann to the Sharpings in 1992 and Bret's subsequent acknowledgments that RH-2 was not part of the Ranch's real estate holdings "clearly shows that the Sharpings had more than simple permission from any of the Healy partnerships claiming an interest in this land[.]"

[¶31.] HRP appeals, raising two issues, which we have restated as follows:

1.  Whether the circuit court erred when it granted the Mineses' motion to dismiss.

2.  Whether the circuit court erred when it granted the Mineses' motion for summary judgment on their counterclaim alleging adverse possession.

## Analysis and Decision

### *Dismissal based upon Healy v. Osborne*[8]

[¶32.]    Our rules of civil procedure are modeled after the Federal Rules of Civil Procedure which, for the most part, "eliminated the cumbersome requirement that a claimant 'set out in detail the facts upon which he bases his claim[.]'" *Sisney v. Best Inc.*, 2008 S.D. 70, ¶ 7, 754 N.W.2d 804, 808 (emphasis omitted) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 n.3, 127 S. Ct. 1955, 1965 n.3, 167 L. Ed. 2d 929 (2007)).  Nevertheless, the rules for pleading a claim "still require[ ] a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.*

[¶33.]    Guided by these principles, we adopted the United States Supreme Court's pleading standards in our *Sisney v. Best* decision and moved away from an earlier test for judging the sufficiency of pleadings, which required denial of a motion to dismiss "for failure to state a claim unless it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him

---

8.    In addition to the claims addressed below, HRP also argues that the circuit court erred by not denying as untimely the Mineses' motion to dismiss because it was made after they had served their answer and counterclaim. The question was presented to the court, but it did not address the issue directly in its memorandum decision.  However, we believe HRP's timeliness argument is unconvincing.  Though we have never confronted this issue, federal courts have generally held that a motion to dismiss that follows an answer should be treated as a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  *See, e.g., St. Paul Ramsey Cnty. Med. Center v. Pennington Cnty., S.D.*, 857 F.2d 1185, 1187 (8th Cir. 1988) ("Because the [defendant's] motion to dismiss was filed after the pleadings had closed, we view it as a motion for judgment on the pleadings . . . and we employ the same standard that we would have employed had the motion been brought under Rule 12(b)(6).").  The provisions of SDCL 15-6-12(c), like its federal counterpart, contain an identical provision that limits a court's examination of the sufficiency of the pleadings to the pleadings themselves, which is the standard we use for our analysis here.  *See* Fed. R. Civ. P. 12(d).

to relief." *Sisney*, 2008 S.D. 70, ¶ 7, 754 N.W.2d at 808 (quoting *Schlosser v. Norwest Bank S.D.*, 506 N.W.2d 416, 418 (S.D. 1993) (applying the former test set out in *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80, 84 (1957))). In *Twombly*, the Supreme Court described the contemporary, prevailing standard for the Federal Rules of Civil Procedure in the following terms:

> While a complaint attacked [for failing to state a claim] . . . does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level[.] [T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]

*Sisney*, 2008 S.D. 70, ¶ 7, 754 N.W.2d at 808 (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964–65).

[¶34.] Of course, "[w]e continue to accept the material allegations as true and construe them in a light most favorable to the pleader to determine whether the allegations allow relief." *Id.* ¶ 8, 754 N.W.2d at 809 (citing *Fenske Media Corp. v. Banta Corp.*, 2004 S.D. 23, ¶ 7, 676 N.W.2d 390, 392–93). And we also continue to review a circuit court's determination of a pleading's sufficiency as a question of law using our de novo standard. *Id.* (citing *Elkjer v. City of Rapid City*, 2005 S.D. 45, ¶ 6, 695 N.W.2d 235, 238).

[¶35.] The scope of the information a court may consider when it determines a motion to dismiss for failure to state a claim under SDCL 15-6-12(b)(5) is, by the express provisions of the rule, narrow. "A court may not consider documents

'outside' the pleadings when ruling on a motion to dismiss for failure to state a claim." *Nooney v. StubHub, Inc*, 2015 S.D. 102, ¶ 7, 873 N.W.2d 497, 499 (citing SDCL 15-6-12(b)(5)). The rule further provides that *if* "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment" under SDCL 15-6-56. *Id.*; *see also* SDCL 15-6-12(c).

[¶36.] Converting a motion to dismiss to one for summary judgment in this way is accompanied by the requirement that "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by § 15-6-56." SDCL 15-6-12(c). Failing to convert a motion to dismiss to a summary judgment motion despite a court's consideration of matters beyond the pleadings "can constitute reversible error." *Jenner v. Dooley*, 1999 S.D. 20, ¶ 14, 590 N.W.2d 463, 469 (citing *Eide v. E.I. Du Pont De Nemours & Co.*, 1996 S.D. 11, ¶ 5, 542 N.W.2d 769, 770). But noncompliance may not require reversal "if the dismissal can be justified under § 12(b)(5) standards without reference to matters outside of the pleadings" or if "nothing else could have been raised to alter the entry of summary judgment." *Id.* ¶ 14, 590 N.W.2d at 469–470 (citations omitted).

[¶37.] As it relates to the claim at issue here, the contents of a quiet title complaint must include the following allegations:

> In an action brought pursuant to 21-41-1 it shall be necessary for the plaintiff to state in his complaint in general terms only that he has or claims title in fee to the property . . . which property must be described with sufficient certainty to enable an officer on execution to identify it; that the defendants are proper parties under the provisions of this chapter, and that the action is brought for the purpose of determining all adverse claims to such property and of quieting title thereto in the plaintiff . . . .

SDCL 21-41-11.

[¶38.]    HRP's complaint alleging a quiet title claim satisfies the technical requirements of SDCL 21-41-11 and the *Twombly* standard.  It alleges HRP's claim that it owns RH-2 and includes its legal description.  The complaint does not merely assert a bare allegation of ownership, but lists the basis of its claim, including allegations relating to the chain of title and the Kott deed.  Finally, the complaint also names as defendants those parties who may claim an adverse interest in RH-2.  *See* SDCL 21-41-1 (describing parties who may be named as defendants in a quiet title action).

[¶39.]    The circuit court's decision to dismiss HRP's complaint was erroneous in several respects.  First, relying upon the doctrine of res judicata, the court exceeded the scope of the pleadings[9] and, perhaps more critically, incorrectly read *Healy v. Osborne* to affirm certain factual findings regarding ownership of the Ranch, stating:

> [The *Healy v. Osborne* circuit court] made a specific finding that the 1986 Healy Ranch Partnership never had any title to any land of the Healy Ranch, only the 1972 Partnership did.  That ownership interest was transferred to Healy Ranch, Inc. in 1995.  It is undisputed that the South Dakota Supreme Court affirmed the [circuit court's] findings, which found that the 1986 Partnership never had any land interest in Healy Ranch and

---

9.    *See Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000) (stating that a res judicata defense generally involves an inquiry beyond the pleadings unless the facts are pled in the complaint and subject to judicial notice of the court's own records); *see also Coleman v. Martin*, 363 F. Supp. 2d 894, 903 (E.D. Mich. 2005) (citing *Andrews* and other relevant cases).  In an order denying a motion to reconsider filed by HRP after the circuit court's decision, the court expressly denied relying upon judicially noticed facts.

Bret Healy only had an interest in the 1986 Partnership, not the 1972 Partnership.

[¶40.]    To be clear, we did not decide questions of ownership relating to the Ranch in *Healy v. Osborne*. Rather, we specifically "*decline*[d] to address Bret's claim of ownership because the threshold issue . . . center[ed] on the timeliness of Bret's claims for conversion, breach of contract, fraud, conspiracy to commit fraud, unjust enrichment, breach of fiduciary duties, and negligence." *Healy*, 2019 S.D. 56, ¶ 21, 934 N.W.2d at 563 (emphasis added). We further noted that Bret had not "br[ought] a quiet title action challenging ownership to Healy Ranch." *Id.* ¶ 20 n.2, 934 N.W.2d at 563 n.2.

[¶41.]    We did not depart from our unwillingness to consider the question of ownership for the Ranch in our additional decision to affirm the circuit court's attorney fees award. Instead, we simply held that Bret lacked a "reasonable basis to believe his claims were valid when he filed the lawsuit or that they could survive the statute of limitations defenses." *Id.* ¶ 37, 934 N.W.2d at 567. Our accompanying statement that "Bret filed the lawsuit for the purpose of preventing the sale of the property, not because he believed his partnership interest remained enforceable" was not a definitive determination of the Ranch's ownership in direct contravention of our expressly-stated intention *not* to do so. *Id.* Rather, this passage should be viewed as a comment upon Bret's motive for bringing the action, which included claims he knew or should have known to be stale.

[¶42.]    Regardless, reliance upon *Healy v. Osborne* for any purpose connected to the ownership of RH-2 is problematic for the additional reason that sale of the Ranch real estate referenced in the opinion included the 1,700 acres actually used

by the Healy family as a ranch, but not RH-2, which the family had not possessed since 1990. As indicated, Bret and the other members of the family regarded RH-2 as being previously transferred. In fact, we held that Bret's claim that Mary Ann had fraudulently transferred RH-2 was also time-barred because he had signed a mortgage in 1999 as the president of HRI "which listed . . . RH-2 as [an] exception[ ] to the property owned by Healy Ranch, Inc." *Id.* ¶ 30 n.7, 934 N.W.2d at 565 n.7.

[¶43.] Finally, the circuit court erroneously granted the motion to dismiss when it concluded that Bret was not authorized to prosecute HRP's quiet title action. In its analysis, the court applied principles of partnership law to facts gleaned from Bret's deposition testimony in the previous litigation and referenced the HRP partnership agreement, both of which are beyond the pleadings.[10]

[¶44.] Under the circumstances, there is no justification to support the circuit court's decision to dismiss the complaint pursuant to the authority of SDCL 15-6-12(b)(5) or SDCL 15-6-12(c). As indicated above, the complaint, on its face, states a quiet title claim, and even viewed as an "unconverted" summary judgment proceeding, the circuit court's ruling is not "justified under § 12(b)(5) standards without reference to matters outside of the pleadings." *See Jenner*, 1999 S.D. 20, ¶ 14, 590 N.W.2d at 470. However, HRP's ability to ultimately prevail on appeal depends upon our determination of the circuit court's summary judgment ruling on the Mineses' adverse possession claim.

---

10. A court may consider documents or attachments "incorporated by reference in the pleadings" when deciding a motion to dismiss under SDCL 15-6-12(b). *See Standard Fire Ins. Co. v. Cont'l Res., Inc.*, 2017 S.D. 41, ¶ 10, 898 N.W.2d 734, 737. However, neither the 1986 partnership agreement nor Bret's deposition testimony were attached to or referenced in the complaint.

***Adverse Possession and an Inconsistent Theory for RH-2***

[¶45.] "We review a circuit court's entry of summary judgment under the de novo standard of review." *Lammers v. State ex rel. Dep't of Game, Fish and Parks*, 2019 S.D. 44, ¶ 9, 932 N.W.2d 129, 132 (citation omitted). "When reviewing a circuit court's grant of summary judgment, this Court only decides whether genuine issues of material fact exist and whether the law was correctly applied." *Id.* (citation omitted). "We view the evidence most favorably to the nonmoving party and resolve reasonable doubts against the moving party." *Id.* (citation omitted). "If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper." *De Smet Farm Mut. Ins. Co. of S.D. v. Busskohl*, 2013 S.D. 52, ¶ 11, 834 N.W.2d 826, 831 (citations omitted).

[¶46.] As we consider the circuit court's summary judgment ruling, we note that "[p]roof of the individual elements of adverse possession present questions of fact for the [trier of fact], while the ultimate conclusion of whether they are sufficient to constitute adverse possession is a question of law." *Gangle v. Spiry*, 2018 S.D. 55, ¶ 11, 916 N.W.2d 119, 123 (citing *Underhill v. Mattson*, 2016 S.D. 69, ¶ 9, 886 N.W.2d 348, 352).

[¶47.] The Legislature has allowed for several types of adverse possession. *See, e.g.*, SDCL 15-3-10 to -13, -15 to -16. Here, the Mineses primarily assert that they have acquired title to RH-2 by adversely possessing the land under the terms of SDCL 15-3-15, the text of which provides:

> Every person in the actual possession of lands or tenements
> under claim and color of title made in good faith, and who shall
> have continued for ten successive years in such possession, and
> shall also during said time have paid all taxes legally assessed

> on such lands or tenements, shall be held and adjudged to be the
> legal owner of said lands or tenements to the extent and
> according to the purport of his paper title. All persons holding
> under such possession by purchase, devise, or descent before
> said ten years shall have expired, and who shall have continued
> such possession and payment of taxes as aforesaid so as to
> complete said term of ten years of such possession and payment
> of taxes, shall be entitled to the benefit of this section.

[¶48.] We have condensed this statute into three textual elements: "(1) claim and color of title made in good faith, (2) ten successive years in possession, and (3) payment of all taxes legally assessed." *Ashby v. Oolman*, 2008 S.D. 26, ¶ 12, 748 N.W.2d 132, 135 (quoting *Andree v. Andree*, 291 N.W.2d 788, 790 (S.D. 1980)). In some of our prior decisions, we have seemed to suggest that these elements represent the exclusive means by which title is determined under SDCL 15-3-15. *See, e.g.*, *Judd v. Meoska*, 76 S.D. 537, 541, 82 N.W.2d 283, 285 (1957) ("The statute speaks to those who *pay taxes*. It offers those who possess property under color of title a method of perfecting their titles through the payment of the taxes legally assessed against that property."); *Andree*, 291 N.W.2d at 790 ("The requirements of this statute include (1) claim and color of title made in good faith, (2) ten successive years in possession, and (3) payment of all taxes legally assessed."); *Hedger v. Aberdeen, B. & N.W. Ry. Co.*, 26 S.D. 491, 128 N.W. 602, 603 (1910) (holding that payment of taxes and possession for at least ten years "in good faith under claim of title and ownership" established title).

[¶49.] But in other decisions we have indicated that an additional element of hostility applies to efforts to obtain title under SDCL 15-3-15, as is the case with more traditional concepts of adverse possession. In *Sioux City Boat Club v. Mulhall*, for instance, we held:

> The ten-year limitation prescribed by [SDCL 15-3-15] does not define the specific character of the possession required to make effective the bar. The decisions hold uniformly that although possession is held under color of title, it will not ripen into a complete title unless it is adverse. The possession must be of such *hostile*, visible and continuous nature as to give the true owner notice of actual possession and to put him on inquiry as to the invasion of his rights and that if he acquiesces in the occupancy for the statutory period he will be barred from maintaining an action thereafter and the title of the adverse occupant will be complete.

79 S.D. 668, 676–77, 117 N.W.2d 92, 96 (1962) (emphasis added) (citation omitted); *see also Barrett v. McCarty*, 20 S.D. 75, 104 N.W. 907, 909 (1905) (holding that payment of taxes by one who possessed land as a cotenant was not adverse and, therefore, insufficient to establish title under a predecessor to SDCL 15-3-15).

[¶50.]    Before addressing the merits of the Mineses' adverse possession claim, however, we must first determine whether Bret, in the name of HRP, may claim the Sharpings' use of RH-2 was permissive, given his position regarding RH-2 in *Healy v. Osborne*. As indicated above, Bret's arguments regarding RH-2 in *Healy v. Osborne* and his assertions regarding the same tract of land made in this action are perceptibly different.

[¶51.]    In *Healy v. Osborne*, Bret alleged that Mary Ann and the family's attorney had actually *transferred* RH-2, though fraudulently and without authority. 2019 S.D. 56, ¶ 6 n.1, 934 N.W.2d at 560 n.1. In fact, Bret claimed during his deposition in the *Healy v. Osborne* litigation that the transfer of RH-2 "has caused the loss of land" because "it was transferred to Raymond Sharping."

[¶52.]    Bret's theory in this quiet title action brought in the name of HRP is different, however. He now claims that RH-2 was *not* transferred. Instead, Bret

asserts that Mary Ann's lack of authority to transfer RH-2 rendered any act to convey the property "null and void," leaving HRP as the owner. With this predicate, Bret develops his factual theory that Raymond Sharping and his successors have, from 1990 to the present, all occupied RH-2 with HRP's permission.

[¶53.] Taking inconsistent positions in this way implicates the doctrine of judicial estoppel and our particular interest in "protect[ing] the essential integrity of the judicial process." *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982). Generally, a party may not successfully maintain a position in litigation only to later change to a contrary position, "especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 1814, 149 L. Ed. 2d 968 (2001) (citation omitted). Judicial estoppel is an equitable doctrine, founded upon fairness and an institutional concern with using judicial proceedings for improper purposes:

> [J]udicial estoppel is unique in that because judicial estoppel is intended to protect the integrity of the fact-finding process by administrative agencies and courts, the issue may properly be raised by courts, even at the appellate stage, on their own motion . . . . The gravamen of judicial estoppel is not privity, reliance, or prejudice. Rather it is the intentional assertion of an inconsistent position that perverts the judicial machinery.

*Hayes v. Rosenbaum Signs & Outdoor Advert., Inc.*, 2014 S.D. 64, ¶¶ 13–14, 853 N.W.2d 878, 882 (cleaned up).

[¶54.] The Wright and Miller Federal Practice and Procedure treatise uses similar pragmatism to describe the justification for judicial estoppel:

> Courts do not relish the prospect that an adept litigant may succeed in proving a proposition in one action, and then succeed in proving the opposite in a second. At worst, successful assertion of inconsistent positions may impose multiple liability

> on an adversary or defeat a legitimate right of recovery. At best, the judicial system is left exposed to an explicit demonstration of the frailties that remain in adversary litigation and adjudication. The theories of judicial estoppel that reduce these risks do not draw directly from the fact of adjudication. Instead, they focus on the fact of inconsistency itself.

§ 4477 Preclusion of Inconsistent Positions—Judicial Estoppel, 18B Fed. Prac. & Proc. Juris. § 4477 (3d ed.)

[¶55.] "[T]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle[.]" *Wyman v. Bruckner,* 2018 S.D. 17, ¶ 12, 908 N.W.2d 170, 175 (quoting *New Hampshire,* 532 U.S. at 750, 121 S. Ct. at 1815). Nevertheless, "for judicial estoppel to apply:"

> The later position must be clearly inconsistent with the earlier one; the earlier position was judicially accepted, creating the risk of inconsistent legal determinations; and the party taking the inconsistent position would derive an unfair advantage or impose an unfair detriment to the opponent if not estopped.

*Id.* (quoting *Wilcox v. Vermeulen,* 2010 S.D. 29, ¶ 10, 781 N.W.2d 464, 468).

[¶56.] Though the Mineses have not expressly invoked the doctrine of judicial estoppel, they have argued that Bret has taken a different position regarding RH-2 in this case than he did in *Healy v. Osborne,* particularly as it relates to his loss-of-land theory that he outlined in his 2017 deposition testimony. Because of our interest in preventing "parties from deliberately changing positions according the exigencies of the moment[,]" *New Hampshire,* 532 U.S. at 750, 121 S. Ct. at 1814 (citation omitted), we will examine the applicability of judicial estoppel here.

[¶57.] As we have related, Bret's position premised upon a transfer of RH-2 in *Healy v. Osborne* is "clearly inconsistent" with his position here that there was no

transfer. But it is made even more so by the accompanying factual claim that the Sharpings' possession and that of their successor has always been permissive. *See State v. Hatchett*, 2014 S.D. 13, ¶ 33, 844 N.W.2d 610, 618 (explaining that the "inconsistency must be about a matter of fact, not law").

[¶58.] Further, breathing life back into the time-barred fraudulent transfer claim by rebranding it into a claim seeking to quiet title, if not to recover damages, provides Bret, and HRP in this case, with an unfair advantage. This type of transformation, if permitted, effectively vacates a portion of our opinion in *Healy v. Osborne*. Our holding that Bret was on notice of the RH-2 transfer by 1999 becomes inaccurate if there was no transfer. *See Healy*, 2019 S.D. 56, ¶ 30 n.7, 934 N.W.2d at 565 n.7 (holding Bret's fraud claim against Mary Ann for transferring RH-2 was untimely because "Bret . . . had at least constructive notice of Mary [Ann's] warranty deed[ ] transferring . . . RH-2 in 1999 when he signed the mortgage with Marquette Bank.").

[¶59.] Indeed, this very holding establishes our acceptance of Bret's "transfer" theory. Without accepting the factual premise that RH-2 had been transferred, we could not have determined the timeliness of his fraud claim against Mary Ann. The fact that the claim itself was time-barred does not change or alter the fact that we accepted the factual assertion that there was a transfer to the Sharpings—not permissive use—an essential constituent predicate. As the United States Court of Appeals for the Sixth Circuit has stated:

> Judicial estoppel is not limited to situations in which the party
> has prevailed on the merits by pressing the prior position;
> rather, it requires only "judicial acceptance" of the prior position,

meaning that the court "adopted the position urged by the party, either as a preliminary matter or as part of a final disposition."

*Branch Banking & Tr. Co. v. Pac. Life Ins. Co.*, 645 F. App'x 387, 391 (6th Cir. 2016) (quoting *Reynolds v. C.I.R.*, 861 F.2d 469, 473 (6th Cir. 1988)).

[¶60.] Under the circumstance presented here, the application of judicial estoppel is appropriate. Bret may not, in the name of HRP, re-fashion his claim regarding RH-2 into a quiet title action that contemplates the land was never transferred and, instead, has been permissively used for the past thirty years by others who have farmed it and paid the taxes. In light of this determination, we will now review the merits of the Mineses' adverse possession claim.

[¶61.] As noted above, SDCL 15-3-15 requires "(1) claim and color of title made in good faith, (2) ten successive years in possession, and (3) payment of all taxes legally assessed." *Ashby*, 2008 S.D. 26, ¶ 12, 748 N.W.2d at 135 (citation omitted).

[¶62.] We have previously defined color of title "as that which is title in appearance, but not in reality." *Mulhall*, 79 S.D. 668, 675, 117 N.W.2d at 96; *see also Wood v. Conrad*, 2 S.D. 334, 50 N.W. 95, 96 (1891) ("'Color of title' is defined to be an apparent title founded upon a written instrument, such as a deed, levy of execution, decree of court, or the like."). "A deed, to constitute color of title, must apparently transfer title to [its] holder; not that the title should purport, when traced back to its source, to be an apparently legal title, but the instrument relied upon must profess to convey a title to the grantee." *Wood*, 50 N.W. at 97.

[¶63.] The notion of good faith is defined as an "honest belief[.]" *Parker v. Vinson*, 11 S.D. 381, 77 N.W. 1023, 1024 (1899); *see also Garret v. BankWest, Inc.*,

459 N.W.2d 833, 841 (S.D. 1990) (acknowledging that SDCL 57A-1-201 defines good faith as "honesty in fact"). "What constitutes good faith is a question for the trier of fact." *Andree*, 291 N.W.2d at 791. However, "[b]ad faith is never presumed; one who challenges the good faith of the occupant in this type of case must overcome the presumption of good faith." *Id.*; *see also* 2 C.J.S. Adverse Possession § 297 ("The presumption of good faith obtains until rebutted by proof to the contrary.").

[¶64.] Here, some of these necessary elements are readily established by the undisputed facts presented in the record. First, the warranty deed executed by Randolph Sharping to the Mineses on June 21, 2012, gives the Mineses color of title. The warranty deed "apparently transfer[red] title" to Larry and Sheila Mines. *Wood*, 50 N.W. at 97. And the undisputed facts indicate that the Mineses have "claimed" RH-2 as their own through their occupation and farming.

[¶65.] Less is known about whether the Mineses honestly believed that the warranty deed executed by Randolph effectively transferred title to RH-2. However, the Mineses benefit from the operation of a presumption that they acted in good faith. *See Lammers*, 2019 S.D. 44, ¶ 9, 932 N.W.2d at 132–33 (citation omitted) ("The party resisting summary judgment must present sufficient probative evidence that would permit a finding in her favor on more than mere speculation, conjecture, or fantasy." (cleaned up)). In the absence of facts contained in the record supporting a reasonable inference of bad faith on behalf of the Mineses, the presumption that they acted in good faith remains intact.[11]

---

11.     HRP also appealed the circuit court's decision to deny its motion for a continuance pursuant to SDCL 15-6-56(f), which authorizes a court to allow a

(continued . . .)

[¶66.]     And even if SDCL 15-3-15 contains a separate element of hostility as *Mulhall* suggests, the Mineses have established no material facts are in dispute as to whether their occupation of RH-2 was hostile to the record owners. We have defined hostility as "the 'physical exclusion of all others under a claim of right.'" *Helleberg v. Estes*, 2020 S.D. 27, ¶ 21, 943 N.W.2d 837, 843 (quoting *Rotenberger v. Burghduff*, 2007 S.D. 19, ¶ 8, 729 N.W.2d 175, 178). The facts are undisputed that the Mineses have paid the property taxes on RH-2 and possessed and farmed RH-2 to the exclusion of all others, acts which are not consistent with permissive use. Even if these undisputed facts could nevertheless allow for an inference of permissive use, our application of judicial estoppel precludes this new claim of Bret's that the Sharpings and the Mineses have occupied RH-2 permissively for thirty years. Therefore, HRP cannot sustain its claim that the Mineses or the

---

(. . . continued)

party resisting summary judgment additional time to conduct discovery. The rule requires the party seeking relief to submit an affidavit, which we have held must "show[ ] how further discovery will defeat the motion for summary judgment." *Stern Oil Co. v. Border States Paving, Inc.*, 2014 S.D. 28, ¶ 26, 848 N.W.2d at 281 (citation omitted). The Rule 56(f) affidavit Bret submitted sought discovery relating to whether the Sharping family or the Mineses believed in good faith that they were the owners of RH-2. However, HRP has not identified a basis to overcome the presumption of good faith *other than* Bret's claim that the possession of the RH-2 by the Sharpings and Mineses was merely permissive—an argument foreclosed by judicial estoppel. But even if this argument was not foreclosed and Bret's ability to discover evidence might have had an impact on the analysis of the Sharpings' or Mineses' good faith, we would still affirm the court's summary judgment in their favor. As noted by the circuit court, the undisputed evidence reveals that the Sharpings and Mineses have openly occupied this property under color of title since 1992, thereby establishing adverse possession under the timeframe required by other applicable statutes noted by the court, none of which require a possessor to have a good faith belief of ownership. *See* SDCL 15-3-10 to 13.

Sharpings did not possess RH-2 in a manner that was hostile to "all others under a claim of right." *Helleberg*, 2020 S.D. 27, ¶ 21, 943 N.W.2d at 843.

[¶67.] Finally, the Mineses acknowledge that they have been in actual possession of RH-2 for approximately eight years from the date of the filing of HRP's complaint—two years short of the ten year-statutory period—but argue they are able to "tack" the additional time of possession of RH-2 by the Sharpings in order to satisfy SDCL 15-3-15's ten-year obligation. "[T]he principle of 'tacking' allows [the current possessor] to add its own claims to that of previous adverse possessors under whom it claims a right of possession." *Estate of Billings v. Deadwood Congregation of Jehovah Witnesses*, 506 N.W.2d 138, 141 (S.D. 1993) (citing *Walker v. Sorenson*, 64 S.D. 143, 148, 265 N.W. 589, 591 (1936)).

[¶68.] The Mineses assert, and we agree, that the text of SDCL 15-3-15 expressly allows tacking to satisfy the ten-year period of possession:

> All persons holding under such possession by purchase, devise, or descent before said ten years shall have expired, *and who shall have continued such possession* and payment of taxes as aforesaid *so as to complete said term of ten years* of such possession and payment of taxes, shall be entitled to the benefit of this section.

(Emphasis added.)

[¶69.] Therefore, the Mineses are able to tack at least two years of possession by Randolph Sharping from the time preceding the execution of the warranty deed in 2012 so long as Randolph Sharping's possession of RH-2 was similarly adverse. And we conclude that the undisputed facts show that it was. HRP does not dispute that Randolph Sharping possessed and farmed the land. Nor does it dispute that he paid the property taxes on RH-2 during his possession. The personal

representative's deed recorded in June 2000 conveying the property to Randolph Sharping from his father's estate gave Randolph color of title. And there is nothing in the record to suggest Randolph's claim to RH-2 was clouded by bad faith or a lack of hostility. Therefore, the circuit court properly concluded that the Mineses have established title to RH-2 by adversely possessing the property under the terms of SDCL 15-3-15.

## Conclusion

[¶70.]     Under the circumstances presented by this case, the circuit court erred when it applied our decision in *Healy v. Osborne* to assess the sufficiency of HRP's complaint. However, for the reasons expressed above, we affirm the court's decision to grant the Mineses' motion for summary judgment on their adverse possession counterclaim based upon the application of SDCL 15-3-15. Consequently, title to RH-2 is quieted with the Mineses, and HRP's own quiet title claim is, by necessity, foreclosed.

[¶71.]     JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.