#30003-r-MES
**2024 S.D. 35**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

EDWARD O. MOHNEN,                                    Plaintiff and Appellee,

    v.

ESTATE OF JOHN J. MOHNEN,
JOHN J. MOHNEN TRUST,                                Defendants and Appellants,

    and

AURORA COUNTY, SOUTH DAKOTA, and
ANY AND ALL SPOUSES OF THE ABOVE
NAMED PERSONS OR UNKNOWN HEIRS,
HEIRS-AT-LAW, DEVISEES, LEGATEES,
EXECUTORS, ADMINISTRATORS,
PERSONAL REPRESENTATIVES, AGENTS
OR LEGAL REPRESENTATIVES, OR
CREDITORS OF ANY DECEASED PERSON;
AND ALL PERSONS UNKNOWN WHO HAVE
OR CLAIM TO HAVE ANY INTEREST, ESTATE
IN, OR LIEN OR ENCUMBRANCE UPON THE
PREMISES DESCRIBED IN THE COMPLAINT,    Defendants,

    and

ESTATE OF JOSEPH J. MOHNEN and
ESTATE OF ANNA MOHNEN,                               Intervenors and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
AURORA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE DAVID KNOFF
Judge

* * * *

ARGUED
JANUARY 10, 2023
OPINION FILED **06/26/24**

**** 

RONALD A. PARSONS, JR. of
Johnson, Janklow, Abdallah
   and Reiter
Sioux Falls, South Dakota

ALBERT STEVEN FOX of
Larson Law, P.C.
Chamberlain, South Dakota

Attorneys for defendants
and appellants.


BRAD A. SCHREIBER
Pierre, South Dakota

Attorney for plaintiff and
appellee.


TIMOTHY R. WHALEN
Lake Andes, South Dakota

Attorney for intervenors
and appellees.

#30003

SALTER, Justice

[¶1.]     Edward Mohnen commenced this action to quiet title to five parcels of land in Aurora County that have remained, at least in part, titled in his father's name after he died intestate in 1969.  The complaint named multiple defendants, including the estate of Edward's late brother John Mohnen and the John J. Mohnen Trust ("John's Trust" and collectively "John's Estate").  In a counterclaim, John's Estate alleged it held a complete fee interest in all the disputed parcels through adverse possession and also asserted the affirmative defense of laches.  Following a court trial, the circuit court rejected both the laches defense and adverse possession theory and then determined ownership for the five tracts at issue, applying intestacy laws to evidence concerning the current state of record title.  We reverse.

**Factual and Procedural Background**

[¶2.]     Decades ago, Joseph and Anna Mohnen farmed and raised cattle in rural Aurora County.  The couple also raised a large family which included fifteen children.  Their oldest, John, became active in his parents' farming business in the 1960s.  The Mohnen farming operation utilized five parcels of farm and pastureland that are at the center of this appeal.  Each parcel at issue was owned by Joseph, Anna, John, or some combination of the three.

[¶3.]     Joseph passed away in 1969 without a will.  However, no one commenced a probate action, and none of his property was ever distributed to his heirs under the laws of intestate succession.  Anna died in 1996, but prior to her death, she had executed and recorded a 1990 warranty deed, which purported to

convey all the farmland at issue here to John. Though Anna left a will, there was no effort to probate it.

[¶4.]     Separate probate actions for Joseph's estate and Anna's estate were finally commenced in 2019. Shortly thereafter, Edward filed the present quiet title action "for the purpose of . . . determining the interest of all parties in and to such property."[1] Edward named as defendants John's Estate and John's Trust as well as several generic groups, including any "heirs-at-law," "spouses of . . . unknown heirs," along with "all persons unknown who have or claim to have any interest" in the parcels. Joseph's estate and Anna's estate intervened in the action. In an amended answer and counterclaim, John's Estate asserted that Edward's quiet title action should be barred under the doctrine of laches and that, in any event, John had acquired fee title to the land through adverse possession years ago under two separate theories.

[¶5.]     The first was predicated upon SDCL 15-3-15, which allows a party to acquire ownership by possessing land "under claim and color of title made in good faith" and paying the taxes for ten successive years. John's Estate claimed that John possessed the five parcels in good faith based upon Anna's 1990 warranty deed and also paid the taxes for the land for at least ten successive years.

[¶6.]     The second adverse possession theory was based upon SDCL 15-3-12 to -13, which contemplates possession for twenty years when "claiming title not

---

1.     While the complaint states that "[t]his action is brought for the purpose of determining all adverse claims to such property and quieting title thereto in the name of the Plaintiff or determining the interest of all parties in and to such property[,]" Edward does not otherwise appear to claim that he should be the sole owner of the parcels.

founded upon a written instrument[.]" John's Estate asserted, in this regard, that "John exclusively used, cultivated, farmed and preserved the parcels . . . and any permissions granted to other family members were not sufficient to defeat his exclusive possession."

[¶7.]  The case was tried to the circuit court.  The passage of fifty-plus years since Joseph's death significantly reduced the sources of evidence available to provide information and context concerning events implicated by the parties' claims. In addition to Anna's passing in 1996, eleven of the fifteen Mohnen children, including John, had also died by the time of the trial.[2]  Testimony was limited to Edward, Theresa Ishmael (Joseph and Anna's daughter), Doris Maas (Joseph and Anna's granddaughter), and Gabriel Mohnen (Joseph and Anna's grandson and Theresa's son).  The evidence at trial, insofar as it went, established the following.

[¶8.]  After Joseph's 1969 death, John took over the sole responsibility for the farm operation until at least 1998.  This included John's unilateral control over the use of each of the five disputed parcels.  Though Joseph's other heirs, including Edward and John's other siblings, had equitable interests in the land, there is no evidence that John shared the revenues from the farm with his siblings as heirs.

---

2.  John passed away in 2018.  He had created what we have referred to as John's Trust in 2016 and executed a deed purporting to transfer the five parcels at issue here to his Trust.  John named his sister Theresa and his nephew Gabriel as co-trustees.  At present, the co-trustees manage the land by collecting the rents, paying the taxes and other expenses, and making distributions.

Nor is there any indication that John sought any heir's contribution for the expenses of the farm, including real estate taxes.[3]

[¶9.]     At the time of Joseph's death, some of John's fourteen younger siblings had reached the age of majority while others had not. Over time, however, all of his siblings moved off the family farm, with the exception of John's brother Edward, who continues to live in the original family farmhouse.

[¶10.]     Up until the late 1990s, Edward was a self-described "hired man" who earned a wage and worked at John's direction. According to Edward, his responsibilities changed when John retired, at which point Edward claimed to have assumed management of the farm. But the evidence concerning the details of the continuing arrangement between John and Edward was not entirely clear.[4]

---

3.     There was evidence that John assumed responsibility for his mother's living expenses and those of his siblings when they were younger. This appears to be consistent with the widely held understanding that John would take over the family farm and perhaps even a paternal role vis-à-vis his younger siblings.

4.     For instance, there was evidence that Edward paid John rent for the land, but the rate was noticeably low—$8,000 annually for roughly 800 acres. There was also testimony that John remitted this money back to Edward. But whatever the extent of Edward's management, it came to an end in 2016 when John terminated Edward's lease and started renting the land to another farmer. The decision followed a series of events that called into question Edward's judgment, including the realization that Edward had fallen victim to an online "Australian lottery" scam and had parted with large sums of cash through the mail in a vain effort to claim a nonexistent prize. Edward was also convicted of fraud for selling cattle that had been pledged as collateral for loans with a local bank. In a related civil action, the bank obtained a $67,601 judgment following Edward's default on a loan agreement. John's Trust ultimately satisfied the judgment.

[¶11.] A title examiner testified at trial and offered an opinion as to the current state of record ownership for the five Mohnen parcels.[5] It is clear from this testimony that the examiner treated Anna's 1990 warranty deed as a quitclaim deed transferring only her interest in the Mohnen farm real estate to John. With this premise, along with John's 2016 deed transferring all of his interest to John's Trust, the title examiner listed the apparent title record holders as follows:

Parcel #1 (S1/2 NW1/4 of Section 15): Joseph Mohnen

Parcel #2 (N1/2 NW1/4 of Section 15): The John J. Mohnen Trust and Joseph Mohnen

Parcel #3 (NE1/4 of Section 3): The John J. Mohnen Trust and Joseph Mohnen

Parcel #4 (SE1/4 of Section 34): Joseph Mohnen

Parcel #5 (SW1/4 of Section 35): Joseph Mohnen.[6]

[¶12.] In pretrial briefing, John's Estate argued that "[t]hese proceedings are a textbook case for the application of . . . laches to bar [Edward's] extraordinarily untimely claims." John's Estate contended that Edward was "aware of John and/or Anna's claim to the parcels since 1969" and hearing the action would prejudice John's Estate due to the death of many of the witnesses. Joseph's estate and Anna's

---

5. The basis for the opinion is sourced to the title examiner's written "Owner and Encumbrance Report," which contains a disclaimer stating that it "is not a title opinion or a title insurance policy" and is not "to be construed as a legal opinion of title."

6. There was one parcel identified in the complaint for which the ownership was never truly disputed. This particular parcel was purchased by John alone, titled in his name alone, and then transferred to John's Trust. The circuit court granted a directed verdict as to this parcel at trial and named John's Trust as the exclusive owner in fee. That determination is not at issue in this appeal.

estate, joined by Edward, claimed that "once all the facts were ascertained and discovered, [Edward] and [the estates of Joseph and Anna] acted promptly."

[¶13.]     In a memorandum decision, the circuit court declined to apply laches to bar Edward's action, stating, "There are insufficient facts to show there was prior knowledge or intent by the parties to create an unreasonable delay to prejudice the Defendants." The court also rejected both of John's Estate's adverse possession claims, accepting Edward's argument that, under either statutory theory, adverse possession cannot occur between cotenants absent one tenant ending the other's possession, commonly known as an ouster. In the court's view, John could not adversely possess any of the land without "ousting" his jointly possessing cotenant Edward.

[¶14.]     However, the circuit court also made two significant findings of fact that would appear to bear directly upon the specific claim that John acquired title by adverse possession pursuant to SDCL 15-3-15. First, the court found that Edward believed John did, in fact, own the land and only realized John was not the sole owner in 2016 after Edward tried unsuccessfully to enroll some of the land in a federal program. Indeed, this finding concerning Edward's belated discovery that John did not own the land was central to the court's decision not to apply the doctrine of laches.[7]

[¶15.]     Second, the circuit court's finding as to who paid the taxes and when seems particularly relevant to the adverse possession analysis under SDCL 15-3-15.

---

7.     The circuit court found that "*[a]t one point in the eighties*, Ed thought he may have an interest in the land because he and the other siblings were asked to sign a quit claim deed to John." (Emphasis added.)

The court determined that Edward paid the taxes on the land, but only from 2003 until 2016. The evidence otherwise established that John had paid the taxes since he began farming the land after his father passed away, including the 13-year period after Anna's 1990 warranty deed to John until 2003.[8]

[¶16.]     In any event, after deciding that laches and adverse possession were inapplicable, the circuit court declared the ownership of the five parcels. Notably, though, the court did not accept the record ownership described above. Instead, the court used the "law of intestacy at the time of [Joseph's] death" to determine the ownership of the disputed parcels, numerically ordered as they were above, as follows:

> Parcel 1
> Joseph's Estate: 2/3 interest, John's Trust: 1/3 interest
>
> Parcel 2
> Joseph's Estate: 1/3 interest, John's Trust: 2/3 interest
>
> Parcel 3
> Joseph's Estate: 1/3 interest, John's Trust: 2/3 interest
>
> Parcel 4
> Joseph's Estate: 2/3 interest, John's Trust: 1/3 interest
>
> Parcel 5:
> Joseph's Estate: 2/3 interest, John's Trust: 1/3 interest.

---

8.     In its conclusions of law, the circuit court stated that "[w]ho paid the taxes was never fully established at trial." However, when read in the context of the court's findings and the evidence at trial, this conclusion appears to be a reference to disputed testimony concerning whether Edward actually paid the taxes from 2003 to 2016. For this period of time, some of the testimony indicated that John reimbursed Edward for any taxes he paid.

[¶17.] John's Estate appeals, asserting the following issues for our review:[9]

> 1. Whether the circuit court abused its discretion by not applying the doctrine of laches to bar Edward's action.
>
> 2. Whether the circuit court erred when it determined John did not acquire title to all the affected parcels by adverse possession.
>
> 3. Whether the circuit court erred in its division of the parcels.

[¶18.] We believe that it is necessary to address only the question of adverse possession under SDCL 15-3-15, and, accordingly, we begin our analysis there.

## Analysis and Decision

### *Adverse possession under SDCL 15-3-15 and ouster*

[¶19.] "Proof of the individual elements of adverse possession present questions of fact for the [trier of fact], while the ultimate conclusion of whether they are sufficient to constitute adverse possession is a question of law." *Healy Ranch P'ship v. Mines*, 2022 S.D. 44, ¶ 46, 978 N.W.2d 768, 781 (alteration in original) (quoting *Gangle v. Spiry*, 2018 S.D. 55, ¶ 11, 916 N.W.2d 119, 123). "Therefore, the circuit court's factual findings are reviewed for clear error, and its legal conclusions are reviewed de novo." *Underhill v. Mattson*, 2016 S.D. 69, ¶ 9, 886 N.W.2d 348, 352. Additionally, "[t]he claimant has the burden of proving adverse possession by clear and convincing evidence." *Gangle*, 2018 S.D. 55, ¶ 13, 916 N.W.2d at 123 (citing *City of Deadwood v. Summit, Inc.*, 2000 S.D. 29, ¶ 15, 607 N.W.2d 22, 26).

---

9. Edward claims that our ability to conduct appellate review here is compromised because John's Estate did not specifically identify which factual determinations of the court it considered erroneous. We disagree and perceive no difficulty discerning which aspects of the circuit court's decision John's Estate is challenging.

[¶20.] The adverse possession theory set out in "SDCL 15-3-15 requires '(1) claim and color of title made in good faith, (2) ten successive years in actual possession, and (3) payment of all taxes legally assessed.'" *Healy Ranch P'ship*, 2022 S.D. 44, ¶ 61, 978 N.W.2d at 784 (quoting *Ashby v. Oolman*, 2008 S.D. 26, ¶ 12, 748 N.W.2d 132, 135). Noticeably missing from these elements, and the statutory text from which they are sourced, is a discrete notion of exclusivity or hostility.[10] *Compare* SDCL 15-3-15 (quoted in full in footnote 10), *with* SDCL 15-3-12 (requiring "actual continued occupation . . . under a claim of title *exclusive of any other right*" for adverse possession theory not based upon a written instrument (emphasis added)).

[¶21.] We recently noted in *Healy Ranch Partnership v. Mines* that our cases leave some question as to whether SDCL 15-3-15 requires only proof of the three elements identified above or whether an additional, non-textual element of exclusivity or hostility is also necessary. 2022 S.D. 44, ¶¶ 48–49, 978 N.W.2d at 781–82. We observed that "[i]n some of our prior decisions, we have seemed to

---

10. SDCL 15-3-15 provides in its entirety:

> Every person in the actual possession of lands or tenements under claim and color of title made in good faith, and who shall have continued for ten successive years in such possession, and shall also during said time have paid all taxes legally assessed on such lands or tenements, shall be held and adjudged to be the legal owner of said lands or tenements to the extent and according to the purport of his paper title. All persons holding under such possession by purchase, devise, or descent before said ten years shall have expired, and who shall have continued such possession and payment of taxes as aforesaid so as to complete said term of ten years of such possession and payment of taxes, shall be entitled to the benefit of this section.

suggest that these [statutory] elements represent the exclusive means by which title is determined under SDCL 15-3-15. . . . But in other decisions we have indicated that an additional element of hostility applies to efforts to obtain title under SDCL 15-3-15, as is the case with more traditional concepts of adverse possession." *Id.*; *compare Judd v. Meoska*, 76 S.D. 537, 541, 82 N.W.2d 283, 285 (1957), *and Andree v. Andree*, 291 N.W.2d 788, 790 (S.D. 1980), *and Hedger v. Aberdeen, B. & N.W. Ry. Co.*, 26 S.D. 491, 128 N.W. 602, 603 (1910), *with Sioux City Boat Club v. Mulhall*, 79 S.D. 668, 676–77, 117 N.W.2d 92, 96 (1962), *and Barrett v. McCarty*, 20 S.D. 75, 104 N.W. 907, 909 (1905).

[¶22.]     Because we resolved the adverse possession issue on other grounds, we did not need to reconcile the different formulations of the adverse possession requirements for SDCL 15-3-15 in *Healy Ranch Partnership v. Mines*.  However, here, this question of statutory interpretation is squarely presented and impacts our resolution of the dispute before us.  As such, we now hold that SDCL 15-3-15 requires only proof of "(1) claim and color of title made in good faith, (2) ten successive years in possession, and (3) payment of all taxes legally assessed." *Healy Ranch P'ship*, 2022 S.D. 44, ¶ 61, 978 N.W.2d at 784 (citation omitted).

[¶23.]     This interpretation finds support in our well-established rules for statutory interpretation that require nothing more than the application of text where it is plain and unambiguous, as the provisions of SDCL 15-3-15 undoubtedly are. *See, e.g., In re Implicated Individual*, 2021 S.D. 61, ¶ 16, 966 N.W.2d 578, 583.  Grafting onto SDCL 15-3-15 a requirement of hostility, exclusivity, or, in the case of purported cotenants, ouster lacks fidelity to this accepted rule.  It also detracts from

the more useful inquiry under the statute—a possessor's good faith belief of ownership "under claim and color of title[.]" SDCL 15-3-15.

[¶24.]    Indeed, concepts like hostility, exclusivity, or ouster seem too formulaic for an adverse possession claimant who is paying the taxes and has a good faith belief of sole ownership based upon color of title. *See Fuoss v. Dahlke Fam. Ltd. P'ship*, 2023 S.D. 3, ¶ 28, 984 N.W.2d 693, 702 (describing "the possessor's claim to own the land" as "perhaps the most fundamental aspect of adverse possession"). The prototypical possessor asserting a successful claim under SDCL 15-3-15 would not perceive the need to oust another possessor or even regard another possessor as a cotenant. This is particularly true in a case like this one where Edward believed until 2016 that John was, in fact, the record owner of the five parcels.

[¶25.]    Our earlier decisions applying a concept of exclusivity appear to regard a SDCL 15-3-15 -type adverse possession claim as derived from the common law. But as we noted in *Judd*, the SDCL 15-3-15 variety of adverse possession has *statutory* origins. 76 S.D. at 540, 82 N.W.2d at 284 (noting that the 1891 statute, previously codified at SDC 33.0228, was modeled after an Illinois statute); 2 C.J.S. *Adverse Possession* § 229 ("The requirement for the payment of taxes and assessments on the disputed property as an element of adverse possession means that effective payments must be in accord with the requirements of statute."). And, significantly, the *Judd* Court observed that "encourag[ing] the payment of taxes was in the forefront of the legislative mind [as] revealed by the context of the statute and by its title." 76 S.D. at 541, 82 N.W.2d at 285.

[¶26.] Interpreting SDCL 15-3-15 to require exclusivity would effectively amend the text of the statute, which does not currently state an exclusivity requirement, as SDCL 15-3-12 explicitly does. *See Bracken v. S.D. Dep't of Lab. & Regul., Reemployment Assistance Div.*, 2023 S.D. 22, ¶ 20, 991 N.W.2d 89, 94 (holding the "use of different text" to describe related statutory provisions "supports the view that the [ ] standard is not universal"); *see also* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 170 (2012) ("[W]here the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea."). Reading SDCL 15-3-15 in an uncomplicated way also serves as an acknowledgment that judicially incorporating exclusivity or hostility into the statute's text effectively adds words to it—a practice we have justifiably decried as an encroachment upon the province of the Legislature. *See In re Estate of Flaws*, 2016 S.D. 60, ¶ 44, 885 N.W.2d 336, 349 ("Nor can we rewrite the language of the statute as this is an action reserved for the Legislature.").

[¶27.] Therefore, the circuit court's determination that John's Estate must prove an ouster to prevail under its SDCL 15-3-15 adverse possession claim was erroneous.

### *The SDCL 15-3-15 elements*

[¶28.] Turning, then, to the statutory elements set out in SDCL 15-3-15, we conclude that the record, as developed at trial by the parties and determined by the circuit court, establishes each. Initially, we note that Edward does not challenge the claim that John possessed the five parcels throughout his life, which would

necessarily include the successive ten-year period following Anna's 1990 warranty deed and beyond. Indeed, although ouster need not be proven to prevail on an adverse possession claim under SDCL 15-3-15, the principal underpinning of the circuit court's ouster analysis was the determination that John and Edward both possessed the land. *See Iverson v. Iverson*, 87 S.D. 628, 632, 213 N.W.2d 708, 711 (1973) (stating that the requirement to oust a cotenant is an extension of the presumption that cotenants jointly occupy the premises at issue).[11]

[¶29.] Nor does it appear that Edward challenged John's color of title, which we have defined "as that which is title in appearance, but not in reality." *Mulhall*, 79 S.D. at 675, 117 N.W.2d at 96; *see also Wood v. Conrad*, 2 S.D. 334, 50 N.W. 95, 96 (1891) ("'Color of title' is defined to be an apparent title founded upon a written instrument, such as a deed, levy of execution, decree of court, or the like."). "A deed, to constitute color of title, must apparently transfer title to [its] holder; not that the title should purport, when traced back to its source, to be an apparently legal title, but the instrument relied upon must profess to convey a title to the grantee." *Healy Ranch P'ship*, 2022 S.D. 44, ¶ 62, 978 N.W.2d at 784 (citing *Wood*, 2 S.D. 334, 50 N.W. at 97).

---

11. The circuit court relied upon our decision in *Iverson v. Iverson* as a principal basis for its conclusion that ouster was required. In *Iverson*, we stated that "the mere possession by one tenant in common who receives all the rents and profits and pays the taxes on the property, no matter for how long a period, cannot be set up as a bar against the cotenants." 87 S.D. 628, 632–33, 213 N.W.2d 708, 711 (citations omitted). However, the adverse possession theory in *Iverson* was *not* a claim under SDCL 15-3-15. Both of the parties claiming ownership were record owners under a deed from the State of South Dakota, and the assertion of ownership was not made "under claim and color of title[.]" SDCL 15-3-15.

[¶30.] Here, Anna's 1990 warranty deed to John surely satisfied this requirement. Notably, Anna's deed did not, as the circuit court incorrectly determined, merely convey her interest in the five parcels. The 1990 deed was a warranty deed that appeared to convey the land to John in fee. *See* 21 C.J.S. *Covenants* § 21 ("A warranty deed includes the grantor's covenant that the grantor has good, marketable title and guarantees to the grantee the right of quiet possession."). This, by the way, is consistent with virtually all the evidence relating to the understanding among the Mohnen children that John would own the farm, as Anna and Joseph had intended.

[¶31.] The additional concept of good faith describes an "honest belief[.]" *Healy Ranch P'ship*, 2022 S.D. 44, ¶ 63, 978 N.W.2d at 784 (quoting *Parker v. Vinson*, 11 S.D. 381, 77 N.W. 1023, 1024 (1899)). The determination of good faith is a fact question. *Andree*, 291 N.W.2d at 791. However, good faith, rather than bad faith, is presumed, and "one who challenges the good faith of the occupant in this type of case must overcome" that presumption. *Id.*; *see also* 2 C.J.S. *Adverse Possession* § 297 ("The presumption of good faith obtains until rebutted by proof to the contrary.").

[¶32.] Our review of the record fails to reveal any indication that John's good faith was litigated, or even referenced, before or during the court trial. Perhaps for this reason, and given its ouster determination, the circuit court also did not address the topic of good faith in its findings. In their appellate submissions, John's Estate does address the good faith topic in its opening appellate brief, but Edward has not responded to the argument.

[¶33.] Though good faith, like all adverse possession elements, is a question of fact, it does not appear in this case that it was a *disputed* issue of fact. *See Healy Ranch P'ship*, 2022 S.D. 44, 978 N.W.2d 768 (affirming the entry of summary judgment where there was no evidence to rebut the presumption of good faith); *De Smet Farm Mut. Ins. Co. of S.D. v. Busskohl*, 2013 S.D. 52, ¶ 13, 834 N.W.2d 826, 831 (noting that "courts can decide [a] question [of fact] as a matter of law" when facts are not in dispute). From all appearances in the record, the only conclusion we can draw is that the issue of good faith was not litigated, and Edward has not presented any evidence of John's bad faith to rebut the presumption of good faith. Under the circumstances, a remand here would accomplish nothing more than applying the presumption to resolve the issue of good faith. *See State v. Foshay*, 2024 S.D. 12, 4 N.W.3d 256 (determining remanding for findings was unnecessary where the evidence only supported one conclusion). Edward could not, in other words, utilize a remand to now litigate good faith after failing to place it in issue during the circuit court proceeding.

[¶34.] Finally, Edward's realization in 2016 that John did not own the land came long after Anna's 1990 warranty deed to John and his subsequent payment of real estate taxes for the statutory ten-year period. The circuit court findings on this point are somewhat inferential. The court found Edward only arguably began paying taxes after 2003, but the court did not specifically find that John had paid them before that. However, the only evidence in the record is that John had paid the real estate taxes on this land, and we read the finding that Edward began

paying the taxes in 2003 to rest upon the premise that John had previously paid them.

## Conclusion

[¶35.] The circuit court's determination that John's Estate cannot prevail on its adverse possession claim because John did not oust Edward was erroneous. We also conclude that the court's findings establish each of the elements of adverse possession under SDCL 15-3-15. This effectively renders moot the laches question, the alternate adverse possession theory under SDCL 15-3-12 to -13, and the court's determination of ownership shares for the five parcels. We reverse the circuit court's decision denying John's Estate's adverse possession claim under SDCL 15-3-15, and we remand the case for further proceedings consistent with this opinion.

[¶36.] JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.