#31234, #31235-a-MES
**2026 S.D. 30**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

THOMAS LUZIER and
MARCIA LUZIER,                                    Plaintiffs and Appellants,

          v.

ANDREW HEMMAH and
JENNIFER HEMMAH,                            Defendants and Appellees.

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
DAY COUNTY, SOUTH DAKOTA

THE HONORABLE RICHARD A. SOMMERS
Judge

REED RASMUSSEN of
Siegel, Barnett & Schutz, LLP
Aberdeen, South Dakota                    Attorneys for plaintiffs and
                                                            appellants.

GORDON P. NIELSEN of
Delaney, Nielsen & Sannes, P.C.
Sisseton, South Dakota                      Attorneys for defendants and
                                                            appellees.

CONSIDERED ON BRIEFS
APRIL 21, 2026
OPINION FILED **05/13/26**

SALTER, Justice

[¶1.]     This case involves a property boundary dispute between two neighbors who own lakefront property within the Ramona Beach subdivision on Pickerel Lake. The plaintiffs, Thomas and Marsha Luzier,[1] claim to have adversely possessed a strip of land to which the defendants, Andrew and Jennifer Hemmah, hold record title. Following a court trial, the circuit court denied the Luziers' adverse possession claim; it instead granted prescriptive easements for two garages that encroach on the Hemmahs' property within the contested area. The Luziers now appeal, and the Hemmahs filed a notice of review. We affirm.

## Factual and Procedural History

[¶2.]     The Ramona Beach subdivision was originally platted in 1925. At the time, no survey pins were set to mark the property lines within the subdivision, but each lot's width was uniformly established as fifty feet. A picture of the original plat map is provided below.



---

1.     As noted in the circuit court's memorandum decision, Marsha Luzier passed away between the court trial and when the circuit court filed its memorandum decision.

[¶3.]     The dispute in this case pertains to the property line between Lot 8 and Lot 9.  In the above picture, Lot 9 is the rectangle highlighted in yellow, and Lot 8 is the rectangle directly below it.  In terms of cardinal directions, below would also mean south.

[¶4.]     Lot 8 was purchased by Harold and Bernice Webb in the early 1940s. At the time, other members of the Webb family owned Lots 6 and 7.  At some point between 1947 and 1948, the Webbs built a driveway toward the west part—or the "back" side—of Lot 8.  Due to the contour of the land, the northern edge of the driveway consists of a large rock retaining wall.  Below are two contemporary photos showing the driveway and rock wall from different angles.  Both are oriented to look east toward the lake.  The photo on the left depicts a close-up of the rock wall on the driveway's north edge, and the photo on the right shows the driveway itself.

[¶5.]     Significant to the dispute in this appeal is the fact that the northern edge of the rock wall is not coterminous with Lot 8's northern property line.  The rock wall sits a fair distance south of the property boundary.

 

[¶6.]     Also important is the placement of what became the smaller of two garages associated with Lot 9. In 1948, Ben Siebrecht, a past owner of Lot 9, moved the property's original cabin west and south from where it was first constructed to make room for a new cabin that remains today. The original cabin was converted to a garage and is situated in close proximity to Lot 8's rock wall and driveway. The back of the garage can be seen in the two photos above and, as it turned out, extends beyond the property line and onto Lot 8.

[¶7.]     Robert and Teri Johnson, the immediate predecessors of Thomas and Marsha Luzier, purchased Lot 9 in 1979. Two years later, an additional plat was prepared that added outlots on the west side (away from the lake) of each of the existing lakefront lots within the Ramona Beach subdivision. Lot 5A was added to the west end of Lot 8, and Lot 6A was added to the west end of Lot 9. Iron pipes were placed to denote the boundary between Lots 5A and 6A.

[¶8.]     The Johnsons received a quitclaim deed to Lot 6A in 1981. Years later, in 1997, the Johnsons built a large garage on the southwest corner of Lot 6A. This second garage extends over the property line dividing Lots 5A and 6A.

[¶9.]     In 2002, the Webb family had another plat prepared in an effort to turn Lots 7, 8, 5A, and a portion of Lot 4A into a separate addition to the Ramona Beach subdivision. During a related survey, a pin was placed along the lakeside of the lots indicating the property line separating Lot 8 from Lot 9. But the Webbs' plan for the addition never came to fruition, and the plat map was never filed.

[¶10.]     In 2005, Thomas and Marsha Luzier purchased Lots 6A and 9 from the Johnsons. And in 2015, Andrew and Jennifer Hemmah bought Lots 5A and 8 from

a family trust associated with Maurice Webb.[2]  Before purchasing the property, the Hemmahs hired Helms & Associates to conduct a survey of Lots 6, 7, and 8 in 2014. This survey showed the property line markers in the same location as the iron pipes from the 1981 plat for the backlots and the lakeside pin that was set for the 2002 unrecorded plat.  The 2014 survey also revealed that the original cabin-turned garage, which came to be known as the small garage, on Lot 9 encroaches onto Lot 8 near the rock retaining wall and driveway.  In addition, the survey showed the large garage built in 1997 on Lot 6A encroaches onto Lot 5A.  The Hemmahs did not share this survey with the Luziers.

[¶11.]     Initially, the Luziers and Hemmahs were friendly neighbors.  The Luziers' son, Jonathan Fortner, would frequently bring his wife and children to the lake house.  The Fortners' children would play with the Hemmahs' children.  And over time, the two families became good friends with one another.

[¶12.]     Unfortunately, circumstances changed in 2024 when the Hemmahs applied for a variance that would allow them to build a garage on Lot 5A, near the Luziers' large garage.  After receiving notice of the variance request, Jonathan obtained copies of the request, the 2014 survey, and a construction estimate for the new garage.  The latter included the cost to demolish a retaining wall that runs off the southeast corner of the Luziers' large garage.

---

2.     Following Harold Webb's death, the Webbs' land was divided evenly among their three children, Maurice E. Webb, Robert D. Webb, and Marcia W. Bailey.  Around 2003, Maurice Webb ultimately bought out his other two siblings' interests in Lot 8 to become the sole owner.

[¶13.] The Luziers opposed the demolition of the retaining wall and commenced this adverse possession action for the stated purpose of stopping construction of the Hemmahs' proposed garage. In their complaint, the Luziers claim to have acquired ownership of a substantial portion of Lot 8 and Lot 5A through adverse possession. The portion of property claimed by the Luziers is represented in the map below by a dashed line underneath the actual property line and includes the location of the two encroaching garages.



[¶14.] The dashed "use of land line" begins at the left edge of Lot 5A, runs to the corner of the angled retaining wall identified by the encircled 2, connects with the rock wall of the driveway in Lot 8, and then runs at a slight angle from the top right corner of the driveway rock wall to the lake retaining wall on the far right side of the map. The disputed property at the center of this case involves all of the land between this line and the thicker bold line that marks the actual property boundary.

[¶15.] In their answer, the Hemmahs denied the adverse possession allegations and asserted a counterclaim for trespass, a request for a preliminary injunction forbidding the Luziers from entering onto the disputed property, and a request for the court to quiet title. In September 2024, the Luziers amended their complaint to allege that the Hemmahs and their predecessors in interest had acquiesced to the property boundary claimed by the Luziers.

[¶16.] After a hearing, the circuit court entered a preliminary injunction that essentially maintained the status quo. The court's order required the Hemmahs to remove a string fence that they had placed along the property line, though the court allowed the Hemmahs to keep the stakes associated with the temporary fence in place; it allowed the Luziers to "make use of and mow an area the width of a push mower south of the property line established by the 2014 Helms survey"; and it forbade either party from doing any "dirt work, construction, removal of retaining walls or sidewalks, or anything else that damages or changes the character of the disputed area."

[¶17.] A two-day court trial began in May 2025. The circuit court heard testimony from Jonathan Fortner, Thomas and Marsha Luzier, as well as Jennifer and Andrew Hemmah. The parties stipulated to the admission of deposition testimony from the Luziers' predecessors, Teri Johnson and her son Chris Johnson, along with Robert Webb, whose parents owned Lot 8 and who now owns Lot 7, and Robert's son, Vincent Webb. The court also received into evidence the deposition of Charles Dickhut, who is a professional engineer the Luziers hired to develop

opinions about the purpose and effectiveness of earth anchors used to construct the walls of the large garage that extend into Lot 5A.

[¶18.]     In a subsequent written memorandum decision, the circuit court denied the Luziers' adverse possession claim.  In the court's view, the Luziers failed to show the necessary elements of adverse possession by clear and convincing evidence.  The court ordered that "[t]he property lines between the parties['] respective properties are to remain consistent with the legal descriptions contained within the parties' recorded deeds and the recorded plats associated with said properties."

[¶19.]     The circuit court did, however, determine that the Luziers had established prescriptive easements for the two garages that encroach onto the Hemmahs' property.  Notably, though, the Luziers did not seek prescriptive easements for their garages either in their pleadings or in their post-trial brief.  It was the Hemmahs who first broached the topic of prescriptive easements.  And when the court asked both parties to address prescriptive easements in their post-trial briefs, the Hemmahs were the only party to do so.

[¶20.]     After receiving the court's memorandum decision, the Hemmahs prepared a draft judgment and order for the court's consideration.  The Luziers objected to the proposed judgment and order, arguing that the prescriptive easement language did not adequately account for the earth anchors that stabilize the south wall of the Luziers' large garage and extend below the ground into Lot 5A. And despite not seeking any prescriptive easements previously, the Luziers included in their objection a request for an additional prescriptive easement that

would extend five feet south of the sidewalk that runs along the south edge of their

cabin toward the lake.

[¶21.]     The circuit court denied the Hemmahs' proposed judgment and order

and entered its own, which defined the scope of the Luziers' prescriptive easement

as follows:

> Said prescriptive easement for the use of the small and the large garage shall include only that portion of the [Hemmahs'] real property upon which said garage structures now actually occupy, and no other.  Said prescriptive easement shall include the limited right to the use of the easement area and the immediate adjacent area which is necessary to support the maintenance and operation of [the Luziers'] existing garages in the manner in which said existing garages have historically been used.  [The Luziers], as the easement holders, do not have the right to expand the use of the easement beyond that which is necessary to support the maintenance and operation of their existing garages in the manner in which said existing garages have historically been used.

The court did not include the five-foot prescriptive easement that the Luziers

belatedly requested.

[¶22.]     The Luziers now appeal, raising three issues, which we restate as

follows:

> 1.     Whether the circuit court clearly erred by accepting conflicting deposition testimony without specifically analyzing each deponent's credibility.
>
> 2.     Whether the circuit court clearly erred when it determined that the Luziers had not established the elements of adverse possession by clear and convincing evidence.
>
> 3.     Whether the circuit court erred by refusing to expand the prescriptive easements it granted the Luziers.

[¶23.] By way of notice of review, the Hemmahs ask us to decide whether the circuit court erred by granting the Luziers prescriptive easements for their two encroaching garages.

## Analysis and Decision

### *Deposition testimony*

[¶24.] "In all actions tried upon the facts without a jury or with an advisory jury, the court shall . . . find the facts specially and state separately its conclusions of law thereon . . . ." SDCL 15-6-52(a). "Findings of fact, whether based on oral or *documentary evidence*, may not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* (emphasis added).

[¶25.] As previously mentioned, both parties stipulated to the admission of deposition testimony in the form of transcripts from Robert and Vincent Webb, Teri and Chris Johnson, and Charles Dickhut. The Luziers now argue that the circuit court erred because it "apparently did not . . . attempt to weigh the credibility of the witnesses who testified by deposition." This is a reference to the court's statement in its memorandum decision that it would simply accept the testimony of the Johnsons and Robert Webb as conflicting testimony from disinterested witnesses because the court "did not have the opportunity to observe Mr. Webb or the Johnson's [sic] testify."

[¶26.] The Luziers' argument essentially asks us to direct the circuit court to weigh particular evidence in a certain way or use a prescribed method. But this is contrary to our well-established rules for reviewing a circuit court's findings of fact,

which implicate our clear error standard. *See Kirwan v. City of Deadwood*, 2023 S.D. 20, ¶ 30, 990 N.W.2d 108, 116 (Under our "clearly erroneous standard, we will reverse only if after careful review of the entire record we are definitely and firmly convinced a mistake has been committed." (citation modified)); *see also Adrian v. McKinnie*, 2002 S.D. 10, ¶ 8 n.1, 639 N.W.2d 529, 533 n.1 (stating that "[c]redibility findings are best left to the trial court; therefore, we give those findings considerable deference" (citing *In re Regennitter*, 1999 S.D. 26, ¶ 11, 589 N.W.2d 920, 923)).

[¶27.] We see no clear error in the way the circuit court assessed the factual information related by the deposition witnesses. Nor can we accept the idea that the court did not assess any aspect of their credibility. The court determined the witnesses were disinterested and without a partisan stake in the outcome of the litigation. The court simply expressed the view that it could not determine facts from the conflicting testimony using only the pages of their depositions without, as the court noted at trial, "knowing . . . what the voice inflection or mannerisms were when they testified."

[¶28.] There is another aspect to the Luziers' argument relating to the deposition testimony. In their appellate submissions, they dedicate considerable effort to factual arguments relating to the relative credibility of the deposition witnesses and ask us to determine Robert Webb's testimony to be less credible than the Johnsons' testimony. But this, of course, would contravene SDCL 15-6-52(a) and our role as a reviewing court to recognize the primacy of the circuit court's institutional factfinding advantage, which is evident from the record here.

[¶29.] In addition to the deposition testimony, the circuit court heard live testimony from Jonathan Fortner, Thomas and Marsha Luzier, as well as Jennifer and Andrew Hemmah. The court also received close to 100 exhibits, mostly photographs, surveys, and plat maps and, at times, asked its own clarifying questions to understand the facts. Its ultimate findings were the product of its consideration of the entire evidentiary record, as they should be, and the Luziers cite no rule that would allow us to narrowly excise only the portion of the evidentiary record relating to the deposition testimony and determine who among the deposition witnesses was more credible.[3]

***Adverse Possession***

[¶30.] "Proof of the individual elements of adverse possession present questions of fact for the [trier of fact], while the ultimate conclusion of whether they are sufficient to constitute adverse possession is a question of law." *Mohnen v. Est. of Mohnen*, 2024 S.D. 35, ¶ 19, 9 N.W.3d 481, 486 (alteration in original) (quoting *Healy Ranch P'ship v. Mines*, 2022 S.D. 44, ¶ 46, 978 N.W.2d 768, 781). Therefore, "[w]e review the circuit court's factual findings for clear error and its legal

---

3. While not a legal rule, the Luziers do cite to South Dakota Civil Pattern Jury Instruction 1-30-10 as an example of factors the court should have considered when deciding which witness's deposition testimony to believe, including the ability to observe events, memory, prior inconsistent statements, apparent interest or bias, and general reasonableness. But these instructions are simply meant to guide jurors in their factfinding effort. No rule of law requires a finder of fact to formulaically apply specific factors to assess credibility. And in court trials, like we have here, it is "for the trial court to accept as true or reject as untrue the testimony given, and [this] [C]ourt will not disturb its findings unless the evidence clearly preponderates against them." *Chicago, B. & Q.R. Co. v. Wheaton*, 80 N.W.2d 868, 871 (S.D. 1957) (citing *Houck v. Hult*, 258 N.W. 142 (S.D. 1934)).

conclusions de novo." *Fuoss v. Dahlke Fam. Ltd. P'ship*, 2023 S.D. 3, ¶ 22, 984 N.W.2d 693, 701 (quoting *Gangle v. Spiry*, 2018 S.D. 55, ¶ 11, 916 N.W.2d 119, 123). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Eagle Ridge Ests. Homeowners Ass'n, Inc. v. Anderson*, 2013 S.D. 21, ¶ 12, 827 N.W.2d 859, 864).

[¶31.] In an adverse possession action, the party holding record title is presumed to possess the property. *Gangle*, 2018 S.D. 55, ¶ 13, 916 N.W.2d at 123 (citing SDCL 15-3-7). "A person claiming title by adverse possession must prove the following elements by clear and convincing evidence: '(1) an occupation that is (2) open and notorious, (3) continuous for the statutory period, and (4) under a claim of title exclusive of any other right.'" *Fuoss*, 2023 S.D. 3, ¶ 24, 984 N.W.2d at 701 (quoting *Underhill v. Mattson*, 2016 S.D. 69, ¶ 11, 886 N.W.2d 348, 352); *see also* SDCL 15-3-12. "Although the statutory period for adverse possession is 20 years under SDCL 15-3-1, tacking allows a party to add its own claim to that of previous adverse possessors in interest, and under whom the party claims a right of possession." *Titus v. Chapman*, 2004 S.D. 106, ¶ 27, 687 N.W.2d 918, 925–26 (citing *Est. of Billings v. Deadwood Congregation of Jehovah Witnesses*, 506 N.W.2d 138, 141 (S.D. 1993)).

*Occupation*

[¶32.] Under SDCL 15-3-12, "only that portion of land which has been *actually* and *continuously occupied* may be claimed when there is no written instrument forming the basis of the claim." *Lien v. Beard*, 478 N.W.2d 578, 579

(S.D. 1991) (quoting *Cuka v. Jamesville Hutterian Mut. Soc.*, 294 N.W.2d 419, 422).
Moreover, "the [p]roperty will only be deemed adversely possessed if it has been (1) 'protected by a substantial [enclosure]' or (2) 'usually cultivated or improved.'" *Underhill*, 2016 S.D. 69, ¶ 12, 886 N.W.2d at 352 (second alteration in original) (quoting SDCL 15-3-13); *see also Titus*, 2004 S.D. 106, ¶ 28, 687 N.W.2d at 926 ("Occupation must rise to the level of a substantial enclosure or usual cultivation or improvement." (citing *Schultz v. Dew*, 1997 S.D. 72, ¶ 12, 564 N.W.2d 320, 323)).

[¶33.]     This occupation requirement "provides a prerequisite to a justiciable adverse possession claim." *Lewis v. Aslesen*, 2001 S.D. 131, ¶ 7, 635 N.W.2d 744, 746. "Failure to show either a substantial enclosure or usual cultivation or improvement preempts the claim." *Id.* Whether evidence of substantial inclusion constitutes occupancy is a question of law. *Cuka*, 294 N.W.2d at 422.

        *a.*     *Substantial enclosure*

[¶34.]     A fence is the prototypical example of a substantial enclosure. In *Taylor v. Tripp*, the claimant mistakenly believed that her property extended up to "a heavy gauge woven wire combination [fence] with barb wire on the top." 330 N.W.2d 542, 543 (S.D. 1983). In actuality, the claimant's property line "was approximately eleven feet short of this fence." *Id.* We determined that "the evidence disclosed at trial established that the fence line acted as a substantial inclosure." *Id.* at 544.

[¶35.]     Yet, "[a]n enclosure need not be absolutely secure to satisfy the 'substantial enclosure' statutory requirement." *Titus*, 2004 S.D. 106, ¶ 32, 687 N.W.2d at 926 (quoting *Schultz*, 1997 S.D. 72, ¶13, 564 N.W.2d at 323). In the past,

we have recognized that a natural barrier, such as a river, can serve as a substantial enclosure when it surrounded the disputed land "the same as if a fence had in fact been erected around it." *Cuka*, 294 N.W.2d at 422.

[¶36.]     And in *Lewis v. Moorhead*, we concluded that even a partial fence can constitute a substantial enclosure: "a white wooden fence, which bordered a portion of the property approximately the length of [the defendant's] residence," was a substantial enclosure. 522 N.W.2d 1, 2, 3 n.4 (S.D. 1994). "Even though the white fence did not run the entire distance between the lots, it did provide a physical and visual basis for determining the property line." *Id.* at 3 n.4. In *Lewis*, we remarked parenthetically that "[a]n inclosure having *no purpose of physical exclusion of outside interferences* . . . may be sufficient under the circumstances to indicate, as a matter of fact, the boundaries of an adverse claim." *Id.* (emphasis added) (quoting *Klinefelter v. Dutch*, 467 N.W.2d 192, 194–95 (Wis. 1991)).

[¶37.]     Similarly, in *Schultz v. Dew*, we determined that a row of "seven evergreen trees" planted by claimant along the disputed property boundary was a substantial enclosure, reasoning that the tree line is a type of "deliberate enclosure" because the claimant "planted and maintained the trees." 1997 S.D. 72, ¶¶ 5, 13, 564 N.W.2d at 321, 323. But in *Ashby v. Oolman*, this Court clarified that a substantial enclosure must be "more than an invisible line" arbitrarily drawn between seemingly random objects found along the disputed property line. 2008 S.D. 26, ¶ 20, 748 N.W.2d 132, 137. Accordingly, the Court rejected Ashby's argument that "the stump of a tree along with a second pine tree and remnants of a

fence, located in the back of the property, constitute[d] a 'substantial enclosure.'" *Id.*

[¶38.]    Here, the circuit court concluded that "[n]o substantial enclosure existed to show either party that [the disputed property] was intended to be connected to Lot 9." The court's conclusion is supported by the record and not clearly erroneous. The property line advanced by the Luziers, which is represented by the "use of land line" in Exhibit 23, closely resembles the "invisible line" that we rejected in *Ashby v. Oolman*. The Luziers' claimed property line runs east along mostly buried earth anchors south of their large garage to the tip of a retaining wall that runs diagonally off the southeast corner of the large garage; it then runs east to an angled driveway retaining wall; at which point it follows that retaining wall in a northeasterly direction; at the end of the driveway wall, the line heads east again south of an oak tree until the lakeside retaining wall.

[¶39.]    Aside from the driveway rock wall, there is no apparent structure—natural or otherwise—that would enclose the disputed area. And though a rock wall could, under certain circumstances, serve as a substantial enclosure, the record makes clear that it did not in this case. For instance, Jonathan Fortner testified that there was no substantial enclosure separating Lot 9 from Lot 8. In his words, "There are no enclosures along the whole of Ramona Beach. There is [sic] improvements." And Thomas Luzier candidly acknowledged that there was no line between Lots 8 and 9 that physically showed their claimed property line. As the Hemmahs' brief pointed out, given the L-shape of the rock wall, the property actually enclosed would be the Hemmahs' driveway.

[¶40.]     Additionally, neither the current nor previous owners of Lot 8 acted as though the rock wall served as an enclosure around Lot 9. Both the Webbs and Hemmahs testified about gardening and landscaping activities they undertook north of the wall.

### b.     Cultivation or improvement

[¶41.]     Because SDCL 15-3-13 is written in the disjunctive, a claim of adverse possession can succeed without a substantial enclosure if the claimant can show that they "usually cultivated or improved" the property in dispute. *Schultz*, 1997 S.D. 72, ¶ 12, 564 N.W.2d at 323 (quoting SDCL 15-3-13). "We have explicitly held that 'regular mowing of the property constitutes cultivation under SDCL 15-3-13(2).'" *Underhill*, 2016 S.D. 69, ¶ 13, 886 N.W.2d at 353 (quoting *Aslesen*, 2001 S.D. 131, ¶ 8, 635 N.W.2d at 747); *see also Jutting v. Hendrix*, 2000 S.D. 25, ¶ 12, 606 N.W.2d 140, 142 (recognizing that "planting and maintenance of the trees along with . . . cleaning of debris . . . and their regular mowing of the property for thirty or forty years constituted cultivation"). "We have also explicitly held that 'landscaping is an improvement to land under SDCL 15-3-13(2).'" *Underhill*, 2016 S.D. 69, ¶ 13, 886 N.W.2d at 353 (quoting *Aslesen*, 2001 S.D. 131, ¶ 8, 635 N.W.2d at 747); *see also Schultz*, 1997 S.D. 72, ¶ 15, 564 N.W.2d at 324 (holding that a "gravel and later asphalt driveway, together with landscaping, constitute[d] an improvement to the land").

[¶42.]     Here, the cultivation or improvement theory required the circuit court to first weigh conflicting evidence regarding who regularly mowed and maintained the strip of property at issue, much of which was presented via depositions, rather

than live testimony. From our review of the record, the court's ultimate conclusion that the Luziers simply did not meet their burden to establish that the owners of Lot 9 "usually cultivated or improved" the disputed land was neither incorrect nor clearly erroneous.

[¶43.] Significantly, to prove occupancy under SDCL 15-3-13(2), the Luziers needed to prove cultivation or improvement by clear and convincing evidence— "more than a mere preponderance but not beyond a reasonable doubt." *In re Zar*, 434 N.W.2d 598, 602 n.7 (S.D. 1989) (quoting *Cromwell v. Hosbrook*, 134 N.W.2d 777, 780 (S.D. 1965)). This standard requires evidence that is "so clear, direct and weighty and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Id.* (citation omitted). Under the circumstances and particularly given the court's correct application of the heightened standard of proof, we cannot say the circuit court's determination was clearly erroneous.

[¶44.] Because SDCL 15-3-13 is "a prerequisite to a justiciable adverse possession claim," the Luziers' failure to show a substantial enclosure or usual cultivation or improvement preempts their adverse possession claim. *Aslesen*, 2001 S.D. 131, ¶ 7, 635 N.W.2d at 746. Accordingly, we need not address the other elements of adverse possession.

***Prescriptive easements***

[¶45.] "A party claiming the existence of a prescriptive easement must meet a two-part test by clear and convincing evidence." *Rotenberger v. Burghduff*, 2007 S.D. 19, ¶ 8, 729 N.W.2d 175, 178 (citing *Rancour v. Golden Reward Mining Co.*,

2005 S.D. 28, ¶ 7, 694 N.W.2d 51, 53–54). "First, the party must show an open, continued, and unmolested use of the land in the possession of another for the statutory period of 20 years." *Id.* (citation modified). "Second, the party claiming a prescriptive easement must show the property is being used in a manner that is hostile or adverse to the owner." *Id.* (citation modified). These elements "serve to protect the servient [landowner] by providing [them] with notice of a prescriptive right." *Fuoss*, 2023 S.D. 3, ¶ 49, 984 N.W.2d at 706 (quoting *Helleberg v. Estes*, 2020 S.D. 27, ¶ 22, 943 N.W.2d 837, 843–44).

[¶46.] "A prima facie case for a prescriptive easement is established 'by showing an open and continuous use of another's land with the owner's knowledge, creating a presumption that such use is adverse and under a claim of right.'" *Rotenberger*, 2007 S.D. 19, ¶ 9, 729 N.W.2d at 178–79 (quoting *Thompson v. E.I.G. Palace Mall, L.L.C.*, 2003 S.D. 12, ¶ 8, 657 N.W.2d 300, 304). "Once established, a presumption of a prescriptive easement is created from the proof of an uninterrupted adverse use for the prescriptive period." *Id.* ¶ 9, 729 N.W.2d at 179 (citation modified). This "presumption may be rebutted by proof that the use was by permission or not under a claim of right." *Id.* (citation modified).

[¶47.] There is no dispute here that the Luziers' two garages encroached onto the Hemmahs' property. And neither party contests that the encroachment constituted an open, continued, and unmolested use of land owned by another for the twenty-year statutory period; the small garage was moved to its present location in 1948, and the large garage was built in 1997.

[¶48.] The Hemmahs' sole argument on appeal is that the circuit court clearly erred by finding that the garage encroachments were hostile because, in their view, the encroachments were permissive. With respect to the small garage, there is no evidence in the record to show that the encroachment was permissive. Robert Webb admitted in his deposition testimony that he had no knowledge of the small garage's encroachment until the 2002 survey. When asked if he complained to the Johnsons about the encroachment, he responded, "What good's that going to do? It had been sitting there since 1948. I showed him. I showed him where it was. But I said there's nothing either one of us can do about that."

[¶49.] As for the large garage, the circuit court's finding of hostility was not clearly erroneous. In his deposition, Robert Webb explained how he had asked the Johnsons to move their large garage to the north when they had initially started building it because he believed the garage was going to be built over the property line. Robert acknowledged that the Johnsons then moved it to the north, "but not far enough." On cross-examination by the Luziers' attorney, Robert explained that he was in Sioux Falls when the garage was being built and did not actually see if the Johnsons moved the large garage to the north; Robert merely told Bob Johnson that "he better move it." And when asked whether he ever discussed the encroachments with the Luziers, Robert responded, "No." Under the circumstances, the circuit court's finding that there was no permission for the new garage was not clearly erroneous.

[¶50.] The Luziers also contend that the circuit court erred by not expanding the prescriptive easement for the large garage to extend an additional fifteen feet

south to protect the integrity of the earth anchors and retaining wall. The Luziers' request, however, risks being overinclusive. During his deposition, Dickhut estimated that the earth anchors were ten to fifteen feet long, but he could not be exact. Given Dickhut's necessarily imprecise testimony, the Luziers' proposal would unnecessarily limit the Hemmahs' use of their own property. By framing the prescriptive easements for both garages to include only "the immediate adjacent area which is necessary to support the maintenance and operation of" the garages, the circuit court properly balanced the Luziers' right to keep and maintain their existing garages with the Hemmahs' right to use their property without undue burden.

[¶51.] Finally, the Luziers also argue that the circuit court erred by not granting an additional prescriptive easement for enhanced lake access through the disputed area between Lots 8 and 9 that would extend five feet south of the Luziers' sidewalk that runs along the southern edge of their cabin. But, as we previously noted, the Luziers did not seek prescriptive easements in either their amended complaint or their post-trial written closing argument.

[¶52.] Instead, it was the Hemmahs who raised the topic, but only for the two garages, not the five-foot access easement. That request came only after the circuit court's decision in the form of an objection to the Hemmahs' proposed judgment. Under the unique circumstances presented here, we believe the prescriptive easement issues relating to the two garages are reviewable on appeal, but we conclude that the Luziers' additional claim for a separate five-foot lake access easement has been waived and is not properly before us.

## Conclusion

[¶53.]     The circuit court's determination that the Luziers had not proven the occupancy element of adverse possession by clear and convincing evidence was based on facts found by the court as part of its unique fact-finding role. These findings are supported by the record, not clearly erroneous, and fatal to the Luziers' adverse possession claim. *See Aslesen*, 2001 S.D. 131, ¶ 7, 635 N.W.2d at 747. The same is true for the Hemmahs' challenge to the court's findings associated with the prescriptive easements for the garages. Under our deferential clear error review, the court's findings that the Hemmahs did not sustain their permissive use claims cannot justify relief on appeal. We affirm the circuit court's disposition on all issues.

[¶54.]     JENSEN, Chief Justice, and DEVANEY, MYREN, and GUSINSKY, Justices, concur.

#31234, #31235



-22-